743 F.2d 93
 POWER AUTHORITY OF the STATE OF NEW YORK, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
NIAGARA MOHAWK POWER CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
NEW YORK STATE ELECTRIC & GAS CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Municipal Electric Utilities Association of New York, State
of New York Public Service Commission, Expansion Power
Industries, Metropolitan Transportation Authority,
Massachusetts Municipal Wholesale Electric Company,
Connecticut Municipal Electric Energy Cooperative, Bethlehem
Steel Corp., General Motors Corp., Occidental Chemical
Corp., Hooker Industrial & Specialty Chemicals, Olin Corp.
and Union Carbide Corp., Vermont Department of Public
Service, Borough of Lansdale, Pennsylvania, Consolidated
Edison Company of New York, Port Authority of New York and
New Jersey, Intervenors.
 Nos. 909, 968 to 981, Dockets 83-4051, 83-4061, 83-4063,
83-4065, 83-4067, 83-4069, 83-4103, 83-4105,
83-4109, 83-4111, 83-4113, 83-4115,
83-4131, 83-4139, 83-4141, 83-4163.
 United States Court of Appeals,
Second Circuit.
 Argued April 12, 1984.
Decided Aug. 15, 1984.
 
 Barry R. Fischer, New York City (Hall, Dickler, Lawler, Kent & Friedman, New York City, Stephen L. Baum, Senior Vice President & General Counsel, Power Authority of the State of New York, New York City, of counsel), for Power Authority of the State of New York.
 Thomas M. Lemberg, Washington, D.C. (Joseph C. Swidler, Swidler, Berlin & Strelow, Chartered, Washington, D.C., Frederic H. Lawrence, Kenneth M. Jasinski, Huber, Lawrence & Abell, New York City, of counsel), for New York State Electric & Gas Corporation.
 J. Cathy Lichtenberg, Washington, D.C. (Wallace L. Duncan, Mark S. Laufman, Duncan, Weinberg & Miller, P.C., Washington, D.C., of counsel), for Municipal Electric Utilities Association of New York State.
 Joshua Z. Rokach, Federal Energy Regulatory Commission, Washington, D.C. (Stephen R. Melton, Acting Gen. Counsel, Jerome M. Feit, Sol., Robert F. Shapiro, Atty., Federal Energy Regulatory Commission, Washington, D.C., of counsel), for Federal Energy Regulatory Commission.
 Jaeckle, Fleischmann & Mugel, Buffalo, N.Y. (John Stenger, Buffalo, N.Y., of counsel), for Niagara Mohawk Power Corp.
 Law Offices of Algird F. White, Jr., Albany, N.Y. (Algird F. White, Jr., Barbara S. Brenner, Albany, N.Y., of counsel), for intervenors Bethlehem Steel Corp., General Motors Corp., Occidental Chemical Corp., Olin Corp. and Union Carbide Corp.
 Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y. (Victor T. Fuzak, Richard F. Campbell, Jerrold S. Brown, Buffalo, N.Y., of counsel), for intervenors Expansion Power Industries Airco, Inc., et al.
 Patterson, Belknap, Webb & Tyler, New York City, McCarthy, Sweeney & Harkaway, Washington, D.C., Gerald Tarrant, Vermont Dept. of Public Service, Montpelier, Vt., for intervenor Vermont Department of Public Service.
 David E. Blabey, Timothy P. Sheehan, New York State Public Service Commission, Albany, N.Y., for New York State Public Service Commission.
 Nixon, Hargrave, Devans & Doyle, Rochester, N.Y. (Richard N. George, Paula M. Connelly, Rochester, N.Y., of counsel), for Rochester Gas and Electric Corp.
 Spiegel & McDiarmid, Washington, D.C. (David R. Straus, Scott H. Strauss, Washington, D.C., of counsel), for intervenors Massachusetts Municipal Wholesale Electric Co. and Connecticut Municipal Electric Energy Cooperative.
 Before LUMBARD, MANSFIELD and WINTER, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Petitions have been filed by various parties to this proceeding for review of a series of decisions of the Federal Energy Regulatory Commission ("FERC", or "the Commission") concerning the allocation of inexpensive hydroelectric power from the Niagara Power Project.[1] The project is administered by the Power Authority of the State of New York ("PASNY"), a New York State agency, under a license from FERC. The federal legislation that created the Niagara Power Project, the Niagara Redevelopment Act, 16 U.S.C. Secs. 836-836a (the "Act" or "NRA"), requires that in disposing of 50% of the power generated by the project the licensee should give preference to public bodies and non-profit cooperatives; that requirement is in turn a condition of PASNY's license. This case is essentially a dispute over whether PASNY allocated sufficient power in 1960-61 to these "preference customers", i.e., municipalities or cooperative electric systems as distinguished from private investor-owned utilities (e.g., Niagara Mohawk Power Corporation, New York State Electric & Gas Corporation, Rochester Gas and Electric Corporation).
 
 
 2
 In May 1978 the Municipal Electric Utilities Association (MEUA), which represents the preference customers, filed a complaint alleging that they had not received all the preference power to which they were entitled; PASNY denied that that was the case. After a series of orders FERC eventually found a middle ground. The Commission agreed that PASNY had failed to fulfill the requirements imposed by its license to meet the "reasonably foreseeable" needs of preference customers when it forecast those needs in 1960-61. However, it also found that PASNY had nevertheless managed to provide MEUA members with enough equivalently priced hydropower from the St. Lawrence Project, which is also administered by PASNY, to meet MEUA's needs through mid-1985; thus, the Commission ruled that no remedy was needed before 1985. For the period following 1985, however, FERC declared void PASNY's contracts with the private utilities and ordered it to supply additional power to MEUA from the Niagara Power Project.
 
 
 3
 Both PASNY (along with the three private, non-preference utilities to which it sells power) and MEUA seek review.[2] PASNY contends that FERC has allocated to MEUA an excessive amount of power, while MEUA claims that FERC has failed to allocate to it all the power to which it is entitled. Both sides raise a barrage of statutory, procedural and equitable considerations in support of their respective positions. We modify FERC's remedy for the post-1985 period to make it consistent with the pre-1985 remedy and direct that if a modification of PASNY's contracts with the private utilities becomes necessary, so-called "expansion power" is not to be exempted from withdrawal for preference customers. We affirm the Commission's orders in all other respects.
 
 BACKGROUND
 
 4
 An understanding of the factual and legislative history of the Niagara Power Project is necessary for consideration of the legal questions presented by this petition. The project can be traced back to 1950, when the United States and Canada signed a treaty providing for expanded use of the Niagara River for hydropower generation. In contrast to the rapid development undertaken by the Canadians, Congress considered several bills during the 1950's but made little progress. The impasse was due to a dispute over whether the river constituted a national or a state resource. Both New York and the federal government already had established power agencies in place. PASNY had been created as an agency of the State of New York in 1931 to develop the St. Lawrence Power Project. See generally New York Public Authorities Law Secs. 1000, et seq. FERC's predecessor, the Federal Power Commission, had been in existence since 1920, when it was created by the Federal Water Power Act. 16 U.S.C. Secs. 791 et seq.[3]
 
 
 5
 The need to develop the Niagara River took on new urgency when the Schoellkopf generating station located at Niagara Falls was destroyed by a rock slide on June 7, 1956. Power was restored to the region only by importing Canadian power at high rates, thereby threatening the viability of Northern New York State's industry, much of which was defense-related. By 1957, two bills were introduced in the Senate, both of which provided for development of the project by PASNY under a license from the Commission. Senator Clark of Pennsylvania introduced S. 512, which was characterized by a "federal preference," such as that contained in the TVA and Bonneville Power Projects. A "federal preference" requires that the project power be sold to rural cooperatives and municipal utilities, on the theory that the price charged by those bodies will provide a "yardstick" that will force down the rates charged by private utilities to domestic and rural consumers. The alternative bill, S. 1037, was introduced by Senators Ives and Javits of New York. Rather than create a "yardstick" as a means of indirectly benefiting consumers, the Ives/Javits bill contained a "state preference" under which priority was given directly to consumers as end-users. That bill was drafted to conform with New York law, which requires that PASNY:
 
 
 6
 develop, maintain, manage, and operate those parts of the ... projects ... in such manner as to give effect to the policy hereby declared ... that in the development of hydro-electric power ... such projects shall be considered primarily as for the benefit of the people of the state as a whole and particularly the domestic and rural consumers to whom the power can economically be made available, and accordingly that sale to and use by industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns to permit domestic and rural use at the lowest possible rates and in such manner as to encourage increased domestic and rural use of electricity.
 
 
 7
 New York Public Authorities Law Sec. 1005(5). For a more detailed discussion of the two bills and their historical setting, see Development of Power at Niagara Falls, N.Y.: Hearings on S. 512 and S. 1037 Before a Subcommittee of the Committee on Public Works, 85th Cong., 1st Sess. (1957) (hereinafter "1957 Senate Hearings").
 
 
 8
 Following hearings on the two bills, the Senate Public Works Committee reported out a compromise bill, S. 2406. An identical bill, H.R. 8643, was enacted into law on August 21, 1957. The preference that resulted was as follows:
 
 
 9
 In order to assure that at least 50 per centum of the project power shall be available for sale and distribution primarily for the benefit of the people as consumers, particularly domestic and rural consumers, to whom such power shall be made available at the lowest rates reasonably possible and in such manner as to encourage the widest possible use, the licensee in disposing of 50 per centum of the project power shall give preference and priority to public bodies and non-profit cooperatives within economic transmission distance. In any case in which project power subject to the preference provisions of this paragraph is sold to utility companies organized and administered for profit, the licensee shall make flexible arrangements and contracts providing for the withdrawal upon reasonable notice and fair terms of enough power to meet the reasonably foreseeable needs of the preference customers.
 
 
 10
 Pub.L. No. 85-159, Sec. 1(b)(1), 71 Stat. 401, codified at 16 U.S.C. Sec. 836(b)(1). The statutory language was adopted verbatim as Article 20 of the license issued by FERC to PASNY to construct and operate the Niagara Project.
 
 
 11
 PASNY immediately set about constructing the project, which was privately financed; PASNY floated several large bond issues to raise the necessary $700 million. The Niagara Project went into service on February 10, 1961, with a dependable capacity rated at 1800 Megawatts (MW). An intertie with the St. Lawrence Project provided another 200 MW.
 
 
 12
 PASNY then made efforts to sell the 1800 MW of power generated by the project. The municipal utilities and other preference customers, which already were using 86 MW furnished by PASNY from the St. Lawrence Project, had very limited immediate need for additional power, see 1957 Senate Hearings, supra, at 73-74. The private utilities which likewise were not looking for an immediate increase in their capacity and would not gain any significant cost advantage by switching to Niagara Project power, were attracted to it only if it were made firmly available on a long-term basis. The non-preference utilities were therefore unwilling to incur the heavy cost and risk involved in committing themselves for large additional amounts of Niagara Project power in the initial years unless they could balance this short-term cost increase by obtaining from PASNY a long-term stable source of non-withdrawable power at a competitive price that might later be used to meet a hoped-for increase in demand.
 
 
 13
 Faced with this market situation PASNY estimated in 1960 that the preference customers would have an immediate use for no more than an additional 75 MW of Niagara Project power and that by 1985, using a 6.2% annual growth factor, their overall needs for this power would be no more than 411 MW, or 325 MW more than the 86 MW supplied from the St. Lawrence Project. PASNY therefore contracted with the preference customers to supply them with the 75 MW they needed and with the non-preference private utilities to sell them the balance of the Niagara Project power until January 1, 1990, on the following terms: 600 MW on a "non-withdrawable" basis[4] over the full term of the contracts and 430 MW on a "withdrawable" basis, i.e., reserving the right to withdraw the power for sale to preference customers. 250 MW of this withdrawable power was on demand to be surrendered by the private utilities to MEUA's members, i.e., preference customers in New York, and the balance of 180 MW to be available for public bodies in neighboring states.
 
 
 14
 In addition, PASNY, as required by Sec. 1(b)(3) of the NRA, agreed to supply Niagara Mohawk Corporation, a private utility, with 445 MW of power to replace power generated from the Schoellkopf plant formerly located on the Niagara River. This "replacement power" is not an issue in this appeal. These contracts made by PASNY for sale of the power to be produced by the project and the projections on which they were based were made public on August 3, 1960. The contracts were approved by Nelson A. Rockefeller, Governor of New York, after opportunity for public comment, as provided by New York's Public Authorities Law Sec. 1009, and became effective when the project started operating on February 10, 1961. No one complained at that time that PASNY's projection for preference needs was made for only 25 years, i.e., until 1985, whereas the contracts with the private, non-preference customers were to continue in effect for 29 years, i.e., until the end of 1989, which was 4- 1/2 years beyond the preference projection. The reason for lack of concern over this difference was that in 1960-61 everyone believed that there would be more than enough power available from the project for preference customers throughout the entire 29-year period. Indeed, MEUA, which now attacks the 1960-61 allocation of power to non-preference customers, then testified in favor of PASNY's contracts with these customers and passed a resolution "unanimously commending" its action.
 
 
 15
 With the aid of 20-20 hindsight it is now apparent that PASNY's 1960-61 predictions were inaccurate. In its inception the Niagara Project was seen primarily as a source of energy for a region that had been underserved. What no one foresaw (or could foresee) at the time was that the 1973 oil embargo, which drastically increased the price of fossil fuels, followed by double-digit inflation would suddenly make hydropower a prized commodity. By the mid-1970's large numbers of industrial customers, attracted by the now relatively low-cost power in the Niagara region, moved into the area, many of them purchasing their hydropower from PASNY's preference customers. By the time of the 1979-80 hearing before the ALJ in this case, preference customers were selling 58% of their hydropower to industrial and commercial users.
 
 
 16
 Thus PASNY's 1960-61 projections for preference customers proved to be vastly insufficient. The 250 MW of withdrawable power sold to the private utilities were diverted to preference customers but proved to be insufficient to meet the latter's needs. PASNY then diverted non-Niagara hydropower to MEUA, providing it with an additional 136.2 MW of St. Lawrence power, which sells at the same low rates as Niagara power. On April 18, 1978, however, PASNY informed MEUA that it had exhausted its supplies of hydropower, that PASNY would not abrogate its existing 1961 contracts with the private utilities for the purpose of diverting additional power to preference customers, and that any additional demand by preference customers would be fulfilled with power from PASNY's next-cheapest source, the FitzPatrick nuclear plant, from which power was later sold to MEUA's members, beginning on October 28, 1979.
 
 
 17
 On May 12, 1978, MEUA filed its complaint against PASNY with FERC, claiming that PASNY was obligated by the terms of its license to furnish preference customers with up to 50% of the Niagara Project's capacity despite its 1961 forecast and entry into long-term contracts to furnish a portion of that 50% to non-preference utilities until 1990.
 
 
 18
 In the first of its seven orders in this case, FERC on November 2, 1979, consolidated MEUA's complaint with a separate action against PASNY by the Village of Ilion, which had been denied 7 MW of power that it proposed to resell to the Remington Arms Company. In that first order, FERC interpreted the governing provisions of the NRA, and hence of PASNY's license, as follows:
 
 
 19
 As we view Section 1(b)(1) of the NRA and Article 20, the natural reading is that PASNY must assess the reasonably foreseeable needs of preference customers at the time that it contracts to sell preference power to a non-preference customer. Then it is only obliged to provide for withdrawal of enough power to meet those needs. The preference power that is not reasonably foreseen to be necessary for preference customers during the life of the contract can then be sold to the non-preference customer on a non-withdrawable basis, thus improving the price that PASNY can command for that power.
 
 
 20
 Finally, FERC ordered that the case be heard by an ALJ to determine whether, as a factual matter, PASNY had complied with its license. In order to make the determination the ALJ was directed to find out "what needs of preference customers were reasonably foreseeable over the lives of the contracts with non-preference customers when they were entered," and, if the latter contracts did not permit sufficient power to be withdrawn to meet those reasonably foreseeable needs (as of 1961), what reformation of the contracts would be needed to do so. 9 FERC (CCH) p 61,128, at 61,249 (Nov. 2, 1979).
 
 
 21
 The ALJ heard 46 days of live testimony relating to PASNY's load forecasting process and possible remedies if a violation were found. In his opinion dated October 22, 1980, the ALJ found that PASNY had violated the provisions of its license by failing in 1960-61 to project adequately the needs of preference customers before entering into long-term contracts with the private utilities. He found that PASNY should have included two municipalities it excluded from its forecast (Jamestown and Plattsburgh), and that by contracting with the private utilities for a period beyond the life of its projections it failed to make the "flexible arrangements" required by Sec. 1(b)(1) of the NRA and Article 20 of its license. The ALJ rejected PASNY's contentions that the continued availability of comparably priced St. Lawrence power constituted a "flexible arrangement" and that the preference under the NRA was not intended to cover power resold by MEUA's members' sales to their industrial customers but only power resold by them to domestic and rural customers. With respect to the latter point, the ALJ held that the statute's "plain meaning ... does not permit any artifical distinction in the end use of preference power." As a remedy, the ALJ declared void from their inception PASNY's contracts with the private utilities, and ordered that provisions be made to determine and meet the preference customers' reasonably foreseeable needs up to June 30, 1985, whereupon the needs would be reconsidered for a longer term. Although there was considerable evidence on the issue, the ALJ made no effort to determine what a reasonable forecast of the preference customers' future needs as of 1960-61 would have been.
 
 
 22
 Both sides took exception to the ALJ's conclusions and there followed a series of opinions from FERC. The first was Opinion 151, 21 FERC (CCH) p 61,021 (Oct. 13, 1982). In Opinion 151, the Commission affirmed the ALJ's interpretation of the statutory preference and his finding that PASNY had violated its obligation to make "flexible arrangements" to meet preference customers' needs. More specifically, the Commission found that PASNY's failure to include Plattsburgh and Jamestown in its 1960-61 projections was "unreasonable," that the 6.2% growth rate PASNY used was so low that it "bordered on arbitrariness," and that PASNY had acted arbitrarily in selling preference power to the private utilities for 29 years while only forecasting preference customers' needs for 25 years.
 
 
 23
 In addition, FERC upheld the ALJ's decision not to reconstruct a projection as of 1960-61; the Commission felt that "any attempt to fix an amount ... retrospectively, and with the unavoidable knowledge of subsequent events, could itself be considered arbitrary; and that it is not necessary to fix such an amount to provide relief." FERC also criticized the projection of its staff witness, Mr. Biggerstaff, as "too low in certain respects," even though it relied on Biggerstaff's projection in finding that PASNY's forecast was inadequate. Finally, the Commission clarified the relief ordered by the ALJ, stating that:
 
 
 24
 PASNY has an alternative obligation under the NRA and the terms of its license for the Niagara Project when it contracts for the sale of preference power to non-preference customers. It can provide for the withdrawal of all the preference power, in which case it doesn't have to forecast the reasonably foreseeable needs of the preference customers. Or it can provide for the withdrawal of less than all the preference power, in which case it is obligated to make such a forecast and provide for the withdrawal of enough power to meet those needs.
 
 
 25
 * * *
 
 
 26
 * * *
 
 
 27
 Since PASNY failed to provide for the withdrawal of enough power to meet the reasonably foreseeable needs of the preference customers, the resulting shortfall can be remedied by holding PASNY to its alternative obligation to provide for the withdrawal of all of the preference power. We prefer such relief over the selection of a specific, but arguably arbitrary, amount from within a zone of reasonableness, and a requirement to provide service at Niagara hydropower rates up to that amount. Accordingly, we find that PASNY's contracts with Niagara Mohawk, NYSEG and RGE are void to the extent that they limit the withdrawal of preference power to less than 50 per cent of the project power, and the preference customers can therefore assert their preferential rights to the preference power that was sold to non-preference customers on a non-withdrawable basis.
 
 
 28
 In short the Commission held that the preference customers were entitled to receive all their current needs up to 50% of the project's output.
 
 
 29
 Both sides again filed petitions for rehearing, which were granted on November 30, 1982. The result was Opinion 151-A, 23 FERC (CCH) p 61,031 (April 6, 1983), in which FERC substantially modified the relief it had ordered in Opinion 151. The Commission concluded that the relief previously ordered was "too harsh in relation to the violation." It therefore reversed itself on the question of reconstructing a 1960-61 forecast and adopted the projections of its staff member, Mr. Biggerstaff. The Commission explained that:
 
 
 30
 we have reviewed on rehearing staff witness Biggerstaff's testimony and found that his calculations are reasonable. Therefore, we are accepting his forecasts as being reasonable even though we found them (in Opinion No. 151, at 71 and 75) to be too low insofar as they included only 50 per cent of Jamestown's needs. We relied on his forecasts in Opinion No. 151, at 71-72 and 75, and, in our judgment, they are the best indication in the record as to how much power should have been segregated on February 10, 1961.
 
 
 31
 Biggerstaff concluded that it was reasonably foreseeable in 1960-61 that the preference customers would need 548.36 MW through June 30, 1985, and that their requirements would increase to 697.53 MW by 1989.
 
 
 32
 In addition to using a reconstructed projection FERC also chose to take into account--for the purposes of fashioning a remedy only--the 86 MW of St. Lawrence power that PASNY had been furnishing to MEUA's members continuously since a date prior to its 1960-61 forecast. Since the public bodies were receiving in 1978 some 547.2 MW from St. Lawrence and Niagara sources combined, the Commission determined that no remedy was needed for the period from 1960 through June 30, 1985:
 
 
 33
 We have concluded that even though PASNY did not make flexible arrangements and contracts as of February 10, 1961, providing for the withdrawal of enough preference power for the reasonably foreseeable needs of the preference customers, PASNY nonetheless, has been providing enough hydropower for the reasonably foreseeable needs of the preference customers. As a result, and since all Niagara and St. Lawrence hydropower is sold at the same rate, we are unable to conclude that the preference customers are entitled to any additional preference power through June 30, 1985. (emphasis in original).
 
 
 34
 With respect to the post-June 1985 period, however, FERC found that the public bodies' reasonably foreseeable needs--again determined as of 1960-61--would increase to 697.53 MW by January 1, 1990, when the contracts with the private utilities would expire, making necessary an increase in their hydropower supplies which had been frozen since 1979. For that four and a half year 1985-90 period, FERC continued to impose the "alternative obligation", i.e., it declared the contracts with the private utilities void as of June 30, 1985, and ordered PASNY to make available all preference power needed by preference customers up to 50% of the project's output. As FERC put it, "the situation will be treated as though PASNY contracted for the withdrawal of all of the preference power." FERC explained that it would be "considerably more simple" to terminate the contracts in 1985 than to implement its own projection of 697.53 MW. It did not explain why it had credited PASNY for the St. Lawrence power PASNY allocated to preference customers prior to mid-1985 but was refusing to allow PASNY the same opportunity to use St. Lawrence power to remedy any shortfall after 1985.[5]
 
 DISCUSSION
 
 35
 Both MEUA and PASNY seek review of FERC's decision. Each raises a number of arguments relating to FERC's interpretation of the NRA, the finding that PASNY violated the terms of its license, and the relief ordered by FERC.
 
 FERC's Interpretation of the NRA Preference
 
 36
 The fundamental issue raised by all the parties is the nature of the preference created by the statute (quoted above at p. 99) and incorporated in Paragraph 20 of PASNY's license. In interpreting the statute and license we are guided by the principle that "great deference" must be shown "to the interpretation given the statute by the officers or agency charged with its administration." Connecticut Fund for the Environment v. EPA, 696 F.2d 169, 173 (2d Cir.1982) (quoting EPA v. National Crushed Stone Association, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980), and Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Of even greater importance in this case is the maxim that "[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive." Bread Political Action Committee v. FEC, 455 U.S. 577, 580, 102 S.Ct. 1235, 1238, 71 L.Ed.2d 432 (1982) (quoting Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); see also Watt v. Alaska, 451 U.S. 259, 285-86, 101 S.Ct. 1673, 1687, 68 L.Ed.2d 80 (1981) (Stewart, J. dissenting).
 
 
 37
 Application of these principles calls for our rejection of MEUA's contention that it is entitled to 50% of the Niagara Project's output regardless of what its members' reasonably foreseeable needs were in 1960-61. Both the plain language of the statute and its legislative history are to the contrary. The statute, although obligating PASNY to give preference to municipal utilities and non-profit cooperatives in disposing of 50% of the project's power, expressly authorizes it to contract for the sale of power to non-preference utilities provided it makes "flexible arrangements and contracts providing for the withdrawal upon reasonable notice and fair terms of enough power to meet the reasonably foreseeable needs of the preference customers." As FERC found, this plainly permits PASNY, once the needs of the preference customers are reasonably projected, to contract for the sale of project power to non-preference customers provided only that it reserves the right to withdraw enough power, up to 50% of the project's total output, to satisfy the preference customers' needs to the extent that those needs could have been reasonably foreseen when the contracts with nonpreference customers were made.
 
 
 38
 PASNY is not, once a reasonable projection has been made, required to furnish further power to preference customers beyond the projected figure until its contracts with the non-preference customers expire. As FERC properly concluded, to interpret the statute as MEUA urges would strip the phrase "reasonably foreseeable" of all meaning. The legislative history, far from suggesting that this phrase may be ignored, reveals Congress' sensitivity to PASNY's concern that the project be economically viable. With preference customers' prospective needs substantially below the 50% figure authorized it was apparent that PASNY, if it was to realize the best possible price for power sold to private utilities, had to be able to sell the balance on non-withdrawable terms. See 1957 Senate Hearings, supra, at 69 (Statement of PASNY Chairman Moses). To require PASNY to insist upon withdrawability of 50% of all project power for preference use even though such use was not reasonably foreseeable would be to stymie it in its negotiations with private utilities; they would either refuse to purchase excess power altogether or demand a much lower price to cover the risk of withdrawal. The 50% figure therefore represents a ceiling on the amount of power MEUA may receive, subject to implementation of the "reasonably foreseeable" provision. FERC correctly rejected MEUA's contrary position.
 
 
 39
 Nor do we find any merit in PASNY's counter-argument that the NRA and Paragraph 20 of PASNY's license obligate it to furnish preference power to municipal utilities for resale only to "domestic and rural consumers," not to industrial or commercial consumers. The statute (quoted above at p. 99), although stating in precatory language that its aim is to assure the availability of power for sale "primarily for the benefit of the people as consumers, particularly domestic and rural consumers," does not so mandate or restrict the sale but instead states in unqualified terms that the licensee "shall give preference and priority to public bodies and non-profit cooperatives within economic transmission distance." The term "domestic and rural consumers" expresses a Congressional expectation, not a mandate, and the word "primarily" does not mean "exclusively". Furthermore, the statute, in then providing for withdrawal of power from private utilities, directs that it be withdrawable to meet the reasonably foreseeable needs of "preference customers," i.e., public bodies and non-profit cooperatives, not "end-users" such as domestic consumers. Thus the statute attaches no strings to resale of power sold by PASNY to public utilities. If Congress had wanted to restrict resale to domestic and rural consumers it could easily have done so simply by stating that the power was to be made available to public bodies "for resale only" to such consumers.
 
 
 40
 Notwithstanding the NRA's plain language, PASNY argues that the statute's legislative history indicates an intent to create an "end-use" restriction on the sale of power to preference customers, limiting resale to domestic and rural consumers as distinguished from commercial or industrial users, and that FERC's contrary interpretation conflicts not only with New York's Public Authorities Law Sec. 1005(5), by which PASNY is governed, but also with prior interpretation of the NRA itself. We find no merit in any of these contentions.
 
 
 41
 The agonizingly long legislative history of the NRA, as might be expected, contains many statements which, when taken out of context, appear to support varied interpretations of the statute. A careful review, however, discloses a clear intent to adopt for 50% of the Niagara Project power a "federal"-type preference. Congress, while concerned with meeting the needs of rural and domestic consumers, believed that all interests could best be served by giving the local entities the right to decide on the ultimate retail distribution of the preference power sold to them. See, e.g., Bonneville Project Act, 16 U.S.C. Sec. 832c(a) (preference given to "public bodies and cooperatives"); Tennessee Valley Authority Act of 1933, 16 U.S.C. Sec. 831i (preference to "States, counties municipalities, and cooperative organizations"). This belief was founded on the so-called "yardstick competition" principle, which assumes that if the municipal entities (as distinguished from the end-users) are supplied with cheap hydropower their lower competitive rates will force the private utilities in turn to reduce their rates, with resulting benefits to all, including rural and domestic consumers. It is not for FERC or ourselves to second-guess that basic determination.
 
 
 42
 In an effort to circumvent this clear Congressional decision PASNY urges that, while the legislative history refers to the federal "yardstick competition" principle, it also contains statements (particularly by New York legislators) advocating adoption of the New York-type statute, which gives an express preference to domestic and rural consumers, and that the NRA represents a "compromise" designed to incorporate the latter. This interpretation is not supported by the legislative history.
 
 
 43
 It is true that the NRA provision represents a compromise, but not of the type suggested by PASNY, which would not be a compromise at all. The subject of the compromise was the extent of the NRA's preference provision, not its nature. Congress decided to adopt a federal-type preference for only 50% of the Niagara project power rather than the 100% that had been provided in other federal power projects and was advocated by some legislators. With respect to the 50% provision, the history is clear that Congress was adopting the usual federal preference, which allows resale to industrial users. Indeed, in the Minority Report accompanying the NRA, S.Rep. No. 539, 88th Cong., 1st Sess. 11 (1957), Senator Neuberger complained about the bill's provision for only a 50% preference but not about the failure to include an "end-use" restriction. Moreover, numerous Congressmen stated that the bill provided for a standard federal preference.[6] If, as PASNY argues, Congress was debating whether to restrict resale of preference power to domestic and rural consumers, one would expect to find some references to it. Yet the entire legislative history of the NRA is barren of any such references. To the contrary the debates were mainly concerned with insuring that the needs of industry, which would bring employment to the area, would be met.[7]
 
 
 44
 PASNY's present interpretation of the NRA is further undermined by its consistently contrary position prior to this litigation. In the past it has argued, both implicitly and expressly, that the NRA authorizes the sale of preference power to industrial and commercial users. Its original 1960-61 forecast did not differentiate between industrial and domestic uses, but purported to cover all of its preference customers' needs. On at least 15 occasions between 1957 and 1976 it allocated additional power to municipal utilities to allow them to serve new industrial customers. Although PASNY would normally grant such a request only when the new industry was not within the service area of one of the three private utilities, in 1976 it allocated an additional 7 MW to the City of Sherill to be resold to Oneida Ltd. Silversmiths over the objection of Niagara Mohawk, which claimed that the allocation for industry violated the NRA. Similarly, in State of Vermont Public Service Board v. PASNY, 55 FPC 1109 (1976), PASNY argued that "[t]he entire history of Federal power marketing demonstrates that the preference is for the distribution organization, i.e. the public body and the nonprofit cooperative.... There is no justification for the [FPC's] staff's effort to look through a nonprofit cooperative recipient of Niagara power to see how many small commercial and industrial customers it serves...." Rebuttal brief dated February 28, 1975, at 3.[8] The record also contains numerous statements by PASNY officials over the years of their intent to meet all the needs of their preference customers, including resale to commercial users.[9] In light of this background, and the NRA's plain language and legislative history, PASNY's changed position is not entitled to any weight.
 
 
 45
 PASNY erroneously contends that our construction of the NRA creates a conflict between state and federal law which Congress sought to avoid. Aside from the fact that if a conflict did exist the federal statute would preempt the state statute, Maryland v. Louisiana, 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), New York Public Authorities Law Sec. 1005(5) requires only that power be sold "primarily," not exclusively, for the benefit of domestic and rural consumers and expressly allows sale to industry as a "secondary purpose." Indeed, it further specifies that municipalities and state political subdivisions may secure only a "reasonable share" of a project's output. These flexible terms are in any event satisfied when, as here, over 40% of the Niagara Project power sold to preference customers is resold to domestic and rural users. Thus, New York law does not support PASNY's present position that it may only sell preference power for resale to domestic and rural consumers. On the contrary, in its submission to the 1957 Senate hearings with respect to the NRA bill PASNY stated that the New York statute which "tells the power authority how to sell power ... recognizes that sales to heavy power consuming industry are necessary in order to ... make the power available at cheap rates to rural and domestic consumers." 1957 Senate Hearings at 71-72.[10]
 
 
 46
 At the same hearings, PASNY Chairman Robert Moses testified that "[i]t is also our duty as trustees to preserve, maintain, and expand industries at or near the source of power which employ large numbers of people and make for prosperity benefiting every family in the region." Id. at 69. Similarly, New York Governor Rockefeller, in approving the contracts between PASNY and the various utilities and cooperatives on January 21, 1961, stated that "there has been a continuing recognition that the Project, while serving the rural and domestic consumers of power, must also spur the economic growth of the area and provide increased job opportunities." Given the repeated statements by PASNY and New York officials about the necessity and desirability of sales to industry, we are unpersuaded that FERC's construction of the NRA conflicts with the relevant provisions of New York law.
 
 
 47
 Finally, we note that FERC's rejection of PASNY's "end-use" contention has not as a practical matter injured domestic and rural consumers. Although MEUA's members presently sell only 42% of their preference power allocation to such consumers, the 58% remaining being supplied to commercial and industrial users, the private utilities are bound by contract to resell 600 MW of their non-withdrawable power at retail at a fixed percentage above cost to domestic consumers.
 
 
 48
 FERC's Finding That PASNY Violated its NRA Obligation
 
 
 49
 PASNY advances several grounds in support of its contention that we should set aside FERC's finding that PASNY violated the terms of its license by failing in 1960-61 to make adequate "flexible arrangements" for the withdrawal from its non-preference customers of sufficient power to meet the reasonably foreseeable needs of its preference customers. None of these arguments are persuasive.
 
 
 50
 The first argument, that the doctrine of laches mandates dismissal of MEUA's complaint, needs little discussion. Although MEUA was aware from 1960-61 of PASNY's Niagara Project power allocations and contracts (even expressing satisfaction with them), and did not commence the present action until 1978, it was lulled into inaction by PASNY's repeated assurances that the needs of preference customers would be met for 25 years and by PASNY's past satisfaction of their increased needs as they developed after market conditions changed following the 1973 oil embargo. It was not until 1978 that PASNY for the first time changed its position and advised MEUA's members of its prospective inability to satisfy their power needs. Within weeks, MEUA instituted this proceeding. Far from considering MEUA's action too late, Niagara Mohawk argued thereafter that MEUA's claim was not yet ripe, since it had thus far received all the power it needed. Indeed, PASNY, in its brief before this court, still makes that same argument with respect to post-1985 relief. See Petitioner's brief filed March 19, 1984, at 61. Under the circumstances, the doctrine of laches is inapplicable. See City of Santa Clara v. Andrus, 572 F.2d 660, 666 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978).
 
 
 51
 PASNY also claims that FERC improperly placed on it the burden of proving that its 20-year old forecasts were reasonable. We disagree. PASNY cites out of context from the ALJ's initial decision certain quotes that might, standing alone, indicate that the ALJ misapplied the burden of proof. A fair reading of his opinion as a whole, however, belies PASNY's assertions. The evidence adduced by MEUA, which was adopted by the ALJ and the Commission, showed that, based on Biggerstaff's projection, PASNY should have allocated several hundred additional MW for preference customers' reasonably foreseeable needs. The ALJ thereupon properly decided that since MEUA had made out a prima facie case the burden of going forward shifted to PASNY, stating that "[t]his initial decision finds and concludes that complainants have established that PASNY's compliance with P.L. 85-159 and the project license is unclear, and that PASNY has not shown that it provided for the reasonably foreseeable needs of preference customers at a time when it entered into contracts with non-preference customers...." (emphasis added). No due process violation has been shown.
 
 
 52
 PASNY next argues that FERC used the wrong standard in reviewing de novo PASNY's 1960-61 forecasts as to the reasonably foreseeable needs of its in-state preference customers and that the proper standard is whether PASNY's determination was arbitrary, capricious or an abuse of discretion. The de novo standard, it is contended, violates principles of federalism in view of the discretion granted to PASNY as a state agency by the NRA and its license to determine in-state customers' needs. PASNY contends that FERC must therefore defer to PASNY's determination as within the "zone of reasonableness." See FPC v. Conway Corp., 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976). We disagree.
 
 
 53
 Whether PASNY is entitled to more deference than other FERC licensees, which include municipalities and state agencies, is doubtful; we are governed by the overriding principle, in administering a single statutory licensing scheme authorized by Congress, as distinguished from a dual system of federal and state licenses, that "the public must receive active and affirmative protection at the hands of the Commission," Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2d Cir.1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). However, it is unnecessary to resolve the issue in this case for the reason that even under the more limited "abuse of discretion" standard urged by PASNY it failed in 1960-61 to meet its obligations under the NRA and Paragraph 20 of its license by entering into 29-year contracts with the private utilities while only projecting preference needs for 25 years. No matter how much deference FERC owes to PASNY, this basic deficiency demonstrates that PASNY's projections were arbitrary and unreasonable. Indeed, the Commission itself found PASNY's load forecast "so unreasonable, in certain respects, as to be arbitrary."
 
 
 54
 Lastly, PASNY argues that, regardless of the deficiency of its 1960-61 forecast methodology and its failure to make a forecast for the 1985-1990 period, it later satisfied its obligation to make "flexible arrangements" for withdrawal of power to meet preference customers' needs by offering to furnish power to such customers from the following other sources: (1) an "intertie" between the Niagara and St. Lawrence projects; (2) out-of-state preference power beyond the needs of out-of-state customers; (3) additional power due to overestimating "load diversity" and "transmission losses"; and (4) 135 MW of St. Lawrence power available from 1985-90. PASNY urges that FERC erred in not treating the availability of power from these other sources as satisfying its NRA obligation. We disagree and affirm FERC's decision substantially for the reasons stated by it. Although the willingness to furnish power from other sources may be relevant in determining a remedy for a violation of the NRA, the only pertinent power for the purpose of determining whether PASNY violated its NRA obligation to make flexible arrangements to meet preference customers' projected needs is Niagara Project power and the only relevant time for compliance was 1960-61 when the forecasts and contracts with non-preference customers were made. The issue in determining whether there has been a violation is not whether there is power available today from some other source; the statute required PASNY, in contracting in 1960-61 with private utilities, to make provision for withdrawal of enough power from the Niagara Project to meet its preference customers' reasonably foreseeable needs. FERC's finding that PASNY failed to do so is supported by substantial evidence. Indeed, PASNY's sole witness on the issue testified that he was unaware of any arrangement made in 1960-61 to meet the preference customers' needs for the period after 1985, even though PASNY contracted for the sale of Niagara Project power during the period 1985-90 to non-preference customers. Moreover, PASNY's position that surplus hydropower has been available since 1978 for preference customers on the same terms as Niagara Project power is refuted by its own insistence upon offering more expensive nuclear power from the FitzPatrick plant to MEUA in 1979. We accordingly affirm FERC's finding that PASNY violated the terms of its license as supported by the law and the evidence.
 
 Extrajudicial Communications with FERC
 
 55
 MEUA contends that FERC's Opinion 151-A should be reversed on the ground that it is based in part on improper political influence and ex parte communications from third parties with members of the Commission. The principal communication was a December 17, 1982, letter from Congressmen Kemp and Conable of New York to the President, which was forwarded by the White House staff to the Commission and resulted in a reply by C.M. Butler III, Commission Chairman. The Kemp/Conable letter complained about the grave economic consequences of FERC's Opinion 151 and its interpretation of the NRA and asked for review of the decision. Chairman Butler replied that petitions for review were pending and would be given careful consideration. An earlier November 30, 1982, letter from Congressman Bill Green of New York to Commissioner J. David Hughes regretted FERC's failure in Opinion 151 to make low-cost power available to the Metropolitan Transit Authority and asked that the opinion not be put into effect until remedies had been exhausted. Commissioner Hughes' reply was essentially noncommittal except to note that pending petitions for rehearing would be given serious consideration. MEUA also points to the attendance by a Staff Assistant and Legal Advisor to Chairman Butler at a February 1983 press conference where he read part of Chairman Butler's reply to the Kemp/Conable letter, following criticism of Opinion 151 by several members of Congress.
 
 
 56
 The foregoing correspondence was placed in the public file and, upon learning of the Kemp/Conable exchange with Chairman Butler, MEUA moved on February 25, 1983, to disqualify the Commission and preclude a ruling on the pending motions for rehearing. On March 10, 1983, Chairman Butler recused himself from further participation in the case and in April 1983 the Commission denied MEUA's motion and issued Opinion 151-A, followed by a supplemental opinion on the disqualification issue.
 
 
 57
 Ex parte communications by Congressmen or any one else with a judicial or quasi-judicial body regarding a pending matter are improper and should be discouraged. On the other hand, the mere existence of such communications hardly requires a court or administrative body to disqualify itself. Recusal would be required only if the communications posed a serious likelihood of affecting the agency's ability to act fairly and impartially in the matter before it. Gulf Oil Corp. v. FPC, 563 F.2d 588, 611-12 (3d Cir.1977). In resolving that issue, one must look to the nature of the communications and particularly to whether they contain factual matter or other information outside of the record, which the parties did not have an opportunity to rebut. See Professional Air Traffic Controllers Organization v. FLRA, 672 F.2d 109, 112-13 (D.C.Cir.1982); United States Lines v. Federal Maritime Commission, 584 F.2d 519, 533-34 (D.C.Cir.1978).
 
 
 58
 The communications here fall far short of meeting these requirements. No new evidence was introduced. There was nothing secret about the letters. MEUA was promptly made aware of the correspondence by the Commission and had a full opportunity to comment and respond. Since MEUA had no rebuttal evidence to offer--indeed, none was called for--an evidentiary hearing was unnecessary. The Commission properly denied MEUA's motion.
 
 The Relief Ordered by FERC
 
 59
 Relying mainly on the testimony and projections of FERC's staff witness, Biggerstaff, an acknowledged expert in the projection of power needs, the Commission eventually found in its Opinion 151-A that in 1960-61 it was reasonably foreseeable that the preference customers would need 548.36 MW through June 30, 1985, which would increase to 697.53 MW by the end of 1989. Since PASNY had been supplying preference customers with substantially all of these reasonably foreseeable needs (i.e. 547.2 MW) from Niagara Project and St. Lawrence power, and would be able to continue doing so until June 30, 1985, the Commission found no need for a remedy for the pre-1985 period. Yet, even though Biggerstaff had made his projection through 1989, the Commission inconsistently decided not to adopt the forecast for the post-1985 period. It instead directed that PASNY's contracts with the private utilities for that period be modified to provide enough preference power to meet the actual needs of MEUA's members during the four and one-half year period from mid-1985 to January, 1990, without disturbing the expansion power (250 MW) and replacement power (445 MW) being sold to private utilities.
 
 
 60
 Both MEUA and PASNY attack this decision. MEUA contends that FERC's reconstructed 1960-61 projection is inadequate in several respects. PASNY argues that the reconstructed 1960-61 projection is excessive in some respects, that FERC lacks power to void its private utility contracts for the post-1985 period, and that the remedy violates and is inconsistent with the Commission's own holding for the pre-1985 period that the preference customers' reasonably foreseeable needs should be determined as of 1960-61, not currently. We will consider each of these contentions in turn.
 
 
 61
 (1) The reconstructed 1960-61 projection of preference customers' reasonable needs.
 
 
 62
 We find nothing improper about FERC's use of a reconstructed 1960-61 projection of preference customers' reasonably foreseeable needs as a basis for determining the remedy for PASNY's violation of its obligation to make such a forecast in 1960-61 when it entered into the contracts with the private utilities. In reviewing the adequacy and reasonableness of FERC's reconstructed calculations we are governed by the rule that they must be upheld if supported by substantial evidence. 16 U.S.C. Sec. 825l (b); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Heads and Threads Co., 724 F.2d 282, 287 (2d Cir.1983). "Substantial evidence", moreover, has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Applying this standard we are satisfied that, although reasonable minds could differ as to the inferences that might be drawn from the proof and the reasonableness of Biggerstaff's forecasts as of 1960-61, FERC's findings are supported by substantial evidence and must be upheld.
 
 
 63
 MEUA challenges FERC's findings on the grounds that Biggerstaff failed to include projections of the needs of certain municipalities in existence in 1960 as well as those of new municipalities that might be created after 1960 and used too low an annual percentage growth rate in forecasting municipalities' post-1960 power needs. With respect to the claim that FERC unreasonably included only part of Jamestown's needs, Biggerstaff, based on his expert analysis of the facts as they appeared in 1960-61, testified that he made only a partial allowance because of Jamestown's self-generation capacity and the uncertainty in 1960-61 whether Jamestown would in fact contract to buy Niagara Project power. A similar situation existed with respect to the Village of Wellsville. This unrefuted expert testimony based on record facts constitutes substantial supporting evidence.
 
 
 64
 MEUA's contention that FERC's failure to include projected needs as of 1960-61 for Lake Placid, Tupper Lake, Greene, Green Island and Richmondville must likewise be rejected. The fact that some of these villages were within PASNY's project area did not obligate it to allocate power to them in the face of evidence that transmission to some was not technically feasible (e.g., Lake Placid, Tupper Lake, and several Long Island communities) and that the others had either stated that they were not interested in purchasing Niagara power or had failed to respond to PASNY's inquiries (e.g., Green Island, Greene and Richmondville).
 
 
 65
 FERC's decision not to require a reconstructed 1960-61 forecast of additional power needs that might arise thereafter as a result of the creation of new municipal systems is likewise supported by substantial evidence. There is record proof that municipal systems' loads declined in the 1940s, 1950s and 1960s, and that in 1960 they were expected to continue doing so. Moreover, it was not expected that all rapidly aging systems would be replaced. In addition, it was reasonably anticipated that the costs incurred by private utilities, although higher than those of Niagara Project power, would soon decline.
 
 
 66
 Nor is FERC's use of a 6.36 percent annual growth rate projected for the 25-year period beginning in 1961 unsupported by substantial evidence. Growth rates, being at best uncertain, are forecast in terms of "zones" or "ranges" of reasonableness rather than more specific figures. See FPC v. Conway Corp., 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976). Messrs. Biggerstaff and Toan, whose expert testimony was accepted by the Commission as credible, suggested that a range of 6-7% was reasonable. A higher range suggested by MEUA's expert (Boudreau) on the basis of experience of the TVA and Bonneville system was reasonably rejected because that power had been resold at close to cost whereas New York municipalities resold Niagara Project power at twice their cost. Thus the higher cost of Niagara power to the user was likely to lead to a lower growth rate.[11]
 
 
 67
 PASNY's contention that FERC's inclusion of the partial needs of Jamestown and the needs of Plattsburgh in its reconstructed 1960-61 forecast is unsupported must be summarily rejected. We have already discussed Jamestown. The record reveals that Plattsburgh is legally entitled to Niagara Project power.
 
 
 68
 (2) The partial voiding of PASNY's contracts with private utilities for the period 1985-90.
 
 
 69
 Although the Commission has broad discretion in determining what relief is appropriate to remedy a violation of the NRA, including in an extreme case voiding in whole or part a contract made in violation of that Act, City of Santa Clara v. Andrus, 572 F.2d 660, 677 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); New York State Electric & Gas Corp. v. FERC, 638 F.2d 388, 397 (2d Cir.1980), cert. denied, 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (1981), the remedy should be reasonably commensurate with the needs of the case; an "overkill" or excessively harsh remedy may be reversed for abuse of discretion. Butz v. Glover Livestock Commission Co., 411 U.S. 182, 185-86, 93 S.Ct. 1455, 1457-58, 36 L.Ed.2d 142 (1973); Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). The purpose of the remedy is not to punish or confer a windfall on the complainant. We believe that the remedy prescribed by the Commission in this case, to the extent that it imposes an "alternative obligation" by partially voiding 39 of PASNY's contracts for the 1985-1990 period and requiring PASNY to meet preference customers' actual rather than reasonably foreseeable needs, exceeds the bounds of reasonableness. With respect to PASNY's failure to furnish to MEUA's members all of the Niagara Project preference hydropower needed to satisfy their reasonably foreseeable needs for the period 1979-1985, FERC decided that instead of imposing an "alternative obligation" for that period it would permit PASNY to make up the deficiency by substituting St. Lawrence hydropower at the same price as Niagara Project power. This fair and reasonable remedy provided MEUA's members with all of the power to which they were entitled during the period except for the difference between the 548.36 MW retrospectively forecast by Biggerstaff and the 547.2 MW provided. To have imposed the "alternative obligation" and required a new 1978 forecast would have been to give MEUA a windfall and unnecessarily subject PASNY to liability claimed by MEUA to amount to some $93 million. See MEUA v. Conable, 577 F.Supp. 158, 162 (D.D.C.1983). Since hydropower is fungible the fact that it is supplied at the same price from the St. Lawrence instead of the Niagara source does not provide MEUA with any basis for complaint.
 
 
 70
 PASNY represents that if the same remedy were imposed for the period from June 30, 1985, to January 1, 1990, it could and would furnish sufficient supplementary hydropower from other sources at the same price to supply all hydropower to which MEUA members are entitled under the NRA, i.e., up to 697.53 MW. Notwithstanding the availability of this remedy FERC inexplicably and inconsistently has imposed its "alternative obligation" for the 1985-1990 period, which would not only subject PASNY to unnecessary punitive consequences but would result in preference customers receiving a greater share of preference power than they are entitled to under the forecast of their reasonably foreseeable needs for the 1985-90 period that has been accepted by FERC.
 
 
 71
 Neither FERC nor MEUA have offered any persuasive reason for imposition of this inconsistent remedy for the 1985-1990 period. If hydropower from a source other than the Niagara Project were not available to fulfill PASNY's obligation under the NRA, MEUA could properly insist upon modification of PASNY contracts with the private utilities to insure withdrawal of whatever amount of power is needed to supply the deficiency. But the remedy cannot be fashioned in a vacuum; it must be designed with the injury in mind so that the least disruptive correction is ordered. Accordingly, we hold that FERC's order must be modified so that its reconstructed 1960-61 forecast, which projects the preference customers' needs at 697.53 MW by the end of 1989, will become the measure of relief for the period from June 30, 1985, through December 31, 1989. In furnishing the necessary power PASNY will be given credit for hydropower supplied by it from other sources at the same price. If PASNY is unable to supply from such other sources sufficient power to meet the needs projected as of 1960-61 for the period up to 1990, its contracts with the private utilities will be modified to permit it to withdraw sufficient preference hydropower, other than replacement power, to supply the deficiency.[12]
 
 CONCLUSION
 
 72
 The remedy for the period from June 30, 1985, through December 31, 1989, is modified in accordance with this opinion. In all other respects the Commission orders are affirmed.
 
 
 
 [1]
 The relevant decisions are the following:
 (1) Order Granting In Part and Denying In Part Motions for Summary Disposition, Providing for Expedited Hearing, and Consolidating Proceedings, 9 FERC (CCH) p 61,128 (November 2, 1979);
 (2) Order Denying Rehearing, 10 FERC (CCH) p 61,001 (January 2, 1980);
 (3) Initial Decision of the Presiding Administrative Law Judge (October 22, 1980);
 (4) Opinion No. 151, Declaratory Opinion And Order Affirming With Modifications Initial Decision On Niagara Preference, 21 FERC (CCH) p 61,021 (October 13, 1982),
 (5) Opinion No. 151-A And Order On Rehearing Modifying Declaratory Opinion and Order On Niagara Preference With Respect To The Remedy, 23 FERC (CCH) p 61,031 (April 6, 1983);
 (6) Supplemental Opinion Explaining Denial of MEUA Motion, 23 FERC (CCH) p 61,064 (April 12, 1983);
 (7) Order Granting Declaratory Relief, Denying In Part and Granting In Part Rehearing, Modifying Opinion No. 151, And Clarifying Opinion No. 151-A, 23 FERC (CCH) p 61,302. (May 27, 1983).
 
 
 [2]
 The three private utilities are Niagara Mohawk Power Corporation, New York State Electric & Gas Corporation (NYSEG), and Rochester Gas and Electric Corporation (RGE). The New York Public Service Commission has also intervened in support of PASNY's position
 In addition, two groups of companies who receive "expansion power" from the Niagara Project, i.e., who have opened new facilities or expanded existing ones in return for Niagara Project hydropower, have also intervened. These are the "Airco" group, consisting of Airco, Inc., Donner-Hanna Coke Joint Venture, Great Lakes Carbon Corp., Moog, Inc., Republic Steel Corp., SKW Alloys, Inc., TAM Ceramics, Inc., and Sohio Industrial Products; and the "Bethlehem Steel" group, consisting of Bethlehem Steel Corp., General Motors Corp., Occidental Chemical Corp., Olin Corp., and Union Carbide Corp.
 For a complete list of other intervenors, see the "appearances" listed supra.
 
 
 [3]
 The functions of the Federal Power Commission ("FPC") were transferred to the Federal Energy Regulatory Commission on October 1, 1977. In this opinion, references to "FERC" or the "Commission" pertaining to dates prior to October 1, 1977, should be construed as references to the FPC
 
 
 [4]
 250 MW of the 600 MW was "Expansion Power", i.e., power sold to two private utilities for direct resale by them without profit to specific industries
 
 
 [5]
 FERC also ruled that PASNY was not to obtain the additional power at the expense of the "expansion industries." See infra note 11
 
 
 [6]
 See, e.g., 103 Cong.Rec. 13,195 (1957) (remarks of Congressman Blatnik) ("This is the first bill in which the Federal preference clause to any degree has been included where a power development has been set up and handled by an agency other than the Federal Government."); 103 Cong.Rec. 14,450 (1957) (remarks of Senator Kerr) ("one-half [of project power] to which the Federal purpose [sic] clause was attached"); 103 Cong.Rec. 14,439 (1957) (remarks of Senator Ives) (NRA "contains a Federal preference clause"); 103 Cong.Rec. 14,439 (1957) (remarks of Senator Clark) ("half [of the project's output is] to be reserved under the normal Federal preference clause")
 
 
 [7]
 See, e.g., 103 Cong.Rec. 14,438 (1957) (remarks of Senator Chavez, Chairman of Committee on Public Works) (the "bill makes provisions for meeting the emergency situation created for industry"); 103 Cong.Rec. 14,439 (1957) (remarks of Senator Ives of New York) (NRA would "rescue a vital industrial area from a decline threatening it"). Moreover, neither the Senate nor the House report accompanying the NRA makes any mention of domestic and rural consumers' needs. See S.Rep. No. 539, supra; H.R.Rep. No. 862, 85th Cong., 1st Sess., reprinted in 1957 U.S.Code Cong. & Ad.News 1585
 
 
 [8]
 Upon this appeal PASNY cites as support for its present position the case of Village of Solvay v. Power Authority, 41 A.D.2d 892, 342 N.Y.S.2d 747 (4th Dept.1973), even though it sought to distinguish that case when it took the opposite position in State of Vermont Public Service Board. We are persuaded by its distinction in the latter case rather than by its belated turnabout here
 In Village of Solvay v. Power Authority, a village sued PASNY after its request for an additional allocation for a new industrial customer was refused because the new customer was already being served by Niagara Mohawk. The court ruled for PASNY on the ground that its contract with the village gave PASNY complete discretion over any additional allocations. In dicta, the court went on to state that "[t]he Authority is under no obligation to give priority to a public body unless the giving of such priority will result in the increased availability of low cost electric power to people as consumers and particularly domestic and rural consumers." 41 A.D.2d at 893, 342 N.Y.S.2d at 749. The court cited no support for that statement, however, and to the extent that it purports to limit the NRA's preference to non-industrial users, we reject it for the reasons discussed above.
 While PASNY today points to the Village of Solvay opinion as precedent supporting its interpretation of the NRA, in Vermont Public Service Board, where it argued that municipal utilities were permitted by the NRA to resell their power to industry, PASNY argued that in the Village of Solvay case:
 The Authority denied the Village's application in the exercise of discretion based upon state law grounds and upon the Niagara Redevelopment Act. However, the Authority also took the position that it could have furnished the power to the Village if the Authority determined in its discretion, that it was in the public interest to do so. The court did not reach a different conclusion.
 Rebuttal brief dated February 28, 1975, at 4 (emphasis added).
 
 
 [9]
 For example, on September 18, 1958, Dr. Finla Crawford, a PASNY trustee, addressed the 28th annual conference of MEUA and stated that "the Power Authority wants it clearly understood that we will provide additional power to municipals and cooperatives which they might need to serve new industry within their areas." And, in response to a January 26, 1961, letter from the Village of Arcade inquiring whether it could re-sell power only to consumers or to industry as well, PASNY's General Counsel stated that "[w]e agree that there is nothing in the Authority's contract with Arcade or in the Governor's statement of approval which would prevent the benefits from the purchase of Project power being passed on to all classes of customers served by the village." Letter from Thomas F. Moore, Jr., to Guy Paschal, Confidential Law Assistant, dated February 1, 1961 (Petitioner's exhibit 70)
 
 
 [10]
 PASNY explained that:
 Unlike the waters impounded by some of the big Government dams in the West, the waters of ... the Niagara cannot be stored. Power is, therefore produced around the clock and since electricity cannot be stored either, it must be used when produced or go to waste.
 Since rural and domestic consumers use power on an average only about one-half of the time, commonsense and basic economics required that a large part of St. Lawrence power be sold to industries which use huge amounts of electricity and do so 24 hours a day, 365 days a year.... They are the types of industry to which we sold power on the St. Lawrence and to which Niagara power has been sold since the turn of the century.
 Selling power to such industries is necessary not only to prevent waste, but because they supply a good part of the revenue from the project and keep down the cost to other customers.
 1957 Senate hearings at 72.
 
 
 [11]
 Although PASNY, in selling its bonds in 1960, predicted a 7.2% growth rate, the Commission was not required to accept this figure in view of the expert testimony of Messrs. Biggerstaff and Toan
 
 
 [12]
 In the unlikely event that reformation of PASNY's contracts with the private utilities for the 1985-1990 period should become necessary to provide for withdrawal of sufficient additional power to meet preference customers' projected needs, we direct that "expansion power" sold to private utilities (some 250 MW) is not to be exempted from such withdrawal. In our view FERC's decision to exempt "expansion power" from withdrawal is arbitrary and lacks any reasonable basis in the record
 Except for power labelled as withdrawable, the parties did not identify what power not presently sold to preference customers was to be earmarked as preference or non-preference power. Nor did they agree that expansion power was to be treated as non-preference power. Indeed, the NRA does not even mention expansion power, much less state that it is non-preference in character. Although Sec. 1(b)(1) of the NRA obligates private utilities selling power for profit, such as Niagara Mohawk Power Corporation and New York State Electric & Gas Corporation, to make flexible arrangements for withdrawal of power to meet preference customers' needs, it does not limit that obligation to power resold by them at a profit. Absent any identification of expansion power as non-preference in character, no basis exists for exempting it from contributing ratably to any withdrawal that might be required by the Act.
 The only reason stated by FERC for exempting expansion power from withdrawal, that it would avoid "having to modify contracts to which PASNY was not a party," cannot withstand scrutiny. On the contrary, PASNY is very much a party to these contracts. Under the NRA and PASNY's contracts with the private utilities PASNY has the sole right to determine the amount of power to be allocated, the resale price and the essential terms and conditions of sale. If power is to be withdrawn from the private utilities, regardless how it is to be labelled, FERC must of necessity abrogate portions of PASNY's contracts with the private utilities.