796 F.2d 584
 METROPOLITAN TRANSPORTATION AUTHORITY, Power Authority of
the State of New York, Connecticut Municipal Electric Energy
Cooperative, Allegheny Electric Cooperative, Inc., New
Jersey Board of Public Utilities, Boston Edison Company,
Eastern Edison Company, Fitchburg Gas and Electric Light
Company, and Massachusetts Electric Company, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Municipal Electric Utilities Association of New York State,
Vermont Department of Public Service, Allegheny Electric
Cooperative Inc., Public Service Electric and Gas Company,
Connecticut Municipal Electric Energy Cooperative,
Massachusetts Municipal Wholesale Electric Company, City of
Cleveland, Ohio, New Jersey Board of Public Utilities,
Bethlehem Steel Corporation, Borough of Landsdale, Arlene
Violet, Attorney General of Rhode Island and Rhode Island
Public Utilities Commission, Boston Edison Company, Eastern
Edison Company, Fitchburg Gas and Electric Light Company,
Massachusetts Electric Company, Rockland Electric Co., and
Sussex Rural Electric Cooperative, and New Jersey Preference
Boroughs, Intervenors.
 Nos. 1150 to 1155, Dockets 85-4115, 85-4149, 85-4151,
85-4153, 85-4159, 85-4165.
 United States Court of Appeals,
Second Circuit.
 Argued April 23, 1986.
Decided June 17, 1986.
 
 Gerald Tarrant, Vermont Dept. of Public Service, Montpelier, Vt. (Patterson, Belknap, Webb & Tyler, New York City, McCarthy, Sweeney & Harkaway, P.C., Washington, D.C., of counsel), for intervenor Vermont Dept. of Public Service.
 William E. Mowatt, Gen. Counsel Allegheny Electric Cooperative, Inc., Harrisburg, Pa. (Robert Weinberg, Duncan, Weinberg & Miller, P.C., Washington, D.C., William C. Wise, Chevy Chase, Md., of counsel), for intervenor Allegheny Elec. Cooperative, Inc.
 James R. Lacey, Gen. Sol., Public Service Electric and Gas Company, Newark, N.J., for intervenor Public Service Elec. and Gas Co.
 Marilyn G. Zack, Director of Law, Cleveland, Ohio (June W. Wiener, Chief Asst. Director of Law, William M. Ondrey Gruber, Asst. Director of Law, Cleveland, Ohio, Reuben Goldberg, Goldberg, Fieldman and Letham, P.C., Washington, D.C., of counsel), for intervenor City of Cleveland, Ohio.
 W. Cary Edwards, Atty. Gen., State of N.J., Newark, N.J. (Elise Goldblat, Deputy Atty. Gen., Newark, N.J., of counsel), for intervenor and petitioner New Jersey Bd. of Public Utilities.
 Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C. (William H. Satterfield, Gen. Counsel, Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., of counsel), for respondent Federal Energy Regulatory Com'n.
 Duncan, Weinberg & Miller, P.C., Washington, D.C. (Wallace L. Duncan, J. Cathy Lichtenberg, Jeffrey C. Genzer, Washington, D.C., of counsel), for intervenor Municipal Electric Utilities Ass'n of New York State.
 
 
 1
 Ely, Ritts, Brickfield & Betts, Washington, D.C. (Philip L. Chabot, Jr., Kirk Howard Betts, Washington, D.C., of counsel), for intervenor Sussex Rural Elec. Cooperative.
 
 
 2
 Spiegel & McDiarmid, Washington, D.C. (David R. Straus, Scott H. Struass, Washington, D.C., of counsel), for intervenors Massachusetts Mun. Wholesale Elec. Co. and Connecticut Mun. Elec. Energy Cooperative.
 
 
 3
 Renee Schwartz, New York City (Ezio Scaldaferri, Botein Hays & Sklar, New York City, of counsel), for petitioner Metropolitan Transp. Authority.
 
 
 4
 David R. Straus, Washington, D.C. (Scott H. Strauss, Spiegel & McDiarmid, Washington, D.C., of counsel), for petitioner Connecticut Mun. Elec. Energy Cooperative.
 
 
 5
 Robert Weinberg, Washington, D.C. (Duncan, Weinberg & Miller, P.C., Washington, D.C., William C. Wise, Chevy Chase, Md., William E. Mowatt, Gen. Counsel, Allegheny Electric Cooperative, Inc., Harrisburg, Pa., of counsel), for petitioner Allegheny Elec. Cooperative, Inc.
 
 
 6
 Carmen L. Gentile, Washington, D.C. (Bruder & Gentile, Washington, D.C., of counsel), for petitioners Boston Edison Co., Eastern Edison Co., Fitchburg Gas and Electric Light Co., and Massachusetts Elec. Co.
 
 
 7
 Charles M. Pratt, Senior Vice President and Gen. Counsel, Power Authority of State of N.Y., New York City (Arthur T. Cambouris, Wendy M. Lane, Power Authority of the State of New York, New York City, of counsel), for petitioner Power Authority of State of N.Y.
 
 
 8
 Law Offices of Algird F. White, Jr., Albany, N.Y. (Barbara S. Brenner, Albany, N.Y., of counsel), for intervenor Bethlehem Steel Corp.
 
 
 9
 Wheatley & Wollesen, Washington, D.C. (Charles F. Wheatly, Washington, D.C., of counsel), for intervenor Borough of Lansdale, Pa.
 
 
 10
 Sheldon Whitehouse, Sp. Asst. Atty. Gen., Providence, R.I., for intervenors Arlene Violet, Attorney General of Rhode Island, and Rhode Island Public Utilities Comn.
 
 
 11
 Bruder & Gentile, Washington, D.C. (Carmen L. Gentile, Washington, D.C., of counsel), for intervenors Boston Edison Co., Eastern Edison Co., Fitchburg Gas and Electric Light Co. and Massachusetts Electric Co.
 
 
 12
 LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C. (M. Reamy Ancarrow, Washington, D.C., of counsel), for intervenor Rockland Elec. Co.
 
 
 13
 Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.
 
 MANSFIELD, Circuit Judge:
 
 14
 Nine parties to this proceeding have filed petitions for review of two decisions of the Federal Energy Regulatory Commission ("FERC") concerning the allocation of hydropower produced by the Niagara Power Project ("the Project").[1] The Niagara Redevelopment Act, 16 U.S.C. Sec. 836, et seq., requires the Power Authority of the State of New York ("PASNY"), the licensee authorized to operate the Project, to allocate "a reasonable portion" of the Project power, which may not be more than 10%, to "public bodies and nonprofit cooperatives ... within reasonable economic transmission distance in neighboring states." The petitions challenge FERC's holding that (i) "public bodies" are "publicly-owned sellers and distributors of electricity at retail", (ii) neighboring states include, at least, those states which border New York, (iii) PASNY is required to sell a "reasonable portion" of the Project's power, up to 10%, to public bodies and non-profit cooperatives outside of New York, and that 10% of the Project's power was such a reasonable portion under current circumstances, and (iv) public bodies and non-profit cooperatives outside of New York are not entitled to an extra allotment of power as retroactive relief for PASNY's past failure to sell them 10% of the Project power. We affirm.
 
 BACKGROUND
 
 15
 FERC has licensed PASNY to administer the Niagara Power Project, which generates hydro-electric power from the Niagara River near Niagara Falls. The Niagara Redevelopment Act (the "NRA"), under which the license was issued, provides in pertinent part:
 
 
 16
 "(1) In order to assure that at least 50 per centum of the project power shall be available for sale and distribution primarily for the benefit of the people as consumers, particularly domestic and rural consumers, to whom such power shall be made available at the lowest rates reasonably possible and in such manner as to encourage the widest possible use, the licensee in disposing of 50 per centum of the project power shall give preference and priority to public bodies and nonprofit cooperatives within economic transmission distance....
 
 
 17
 "(2) The licensee shall make a reasonable portion of the project power subject to the preference provisions of paragraph (1) ... available for use within reasonable economic transmission distance in neighboring States, but this paragraph shall not be construed to require more than 20 per centum of the project power subject to such preference provisions to be made available for use in such States. 16 U.S.C. Sec. 836(b)."
 
 
 18
 The "50 per centum" of project power set aside for "public bodies and nonprofit cooperatives" is called "preference power" and the entities eligible to receive it are "preference customers."
 
 
 19
 In March 1980 the Connecticut Municipal Electric Energy Cooperative ("CMEEC") and the Massachusetts Municipal Wholesale Electric Company ("MMWEC") filed complaints against PASNY and motions for partial summary judgment with FERC. Both MMWEC and CMEEC are political subdivisions of their respective states. Their states have designated them bargaining agents "for the procurement" of Niagara power for preference customers in the state. 16 U.S.C. Sec. 836(b)(2). The complaints accused PASNY of refusing, in violation of 16 U.S.C. Sec. 836(b)(2), to sell preference power to the "neighboring states" of Connecticut and Massachusetts or to allocate a full 10% of the Project power to preference customers outside of New York.
 
 
 20
 In its answer PASNY conceded that Connecticut and Massachusetts were "neighboring states" and that it was allocating less than 10% of the Project's power to preference customers outside of New York. It argued, however, that its decision not to sell preference power to CMEEC and MMWEC was justified because it was already selling a "reasonable" portion of such power to preference customers outside of New York, even though the total amount sold was less than 10%. PASNY also noted that it was selling to the New York City Transit Authority ("NYCTA") and to the Metropolitan Transit Authority ("MTA") a portion of the preference power which it would otherwise have sold out-of-state. MTA is the New York State agency responsible for most of the mass transportation services available in the New York City metropolitan area.
 
 
 21
 On September 10, 1980, FERC consolidated MMWEC and CMEEC's complaints. It also granted several petitions to intervene, including those of Allegheny Electric Cooperative (Allegheny) and the Vermont Department of Public Service ("VDPS").[2] Allegheny is an organization of fourteen New Jersey and Pennsylvania rural electrical cooperatives. VDPS is a Vermont state agency responsible for purchasing power from PASNY and other power authorities. Vermont first requested Niagara power in 1960 and VDPS has been buying it since 1962. Unlike CMEEC and MMWEC, the bargaining agencies for Connecticut and Massachusetts, VDPS purchased preference power not only for preference customers but for Vermont consumers served by privately-owned utilities. Since VDPS did not own a distribution network, it did not distribute the power itself but resold the power to private utilities which in turn sold it to retail customers. It, however, "sought to assure that rural and domestic consumers within the State of Vermont [were] benefited by the low cost power made available by requiring the Vermont utilities, whether investor owned, municipals, or cooperatives, to effect rate reductions." State of Vermont Public Service Board v. Power Authority of the State of New York, 55 FPC 1109, 1122 (1976).[3]
 
 
 22
 FERC ruled on CMEEC and MMWEC's complaints and motions for summary judgment on February 13, 1981. Order Granting in Part and Denying in Part Motions for Summary Disposition and Providing for Hearing, 14 FERC (CCH) p 61,127 (Feb. 13, 1981). It held (1) that Connecticut and Massachusetts were "neighboring states" within the meaning of the NRA, (2) that PASNY could not make "substantially disproportionate allocations [of preference power] favor[ing] one neighboring state within economic transmission distance while excluding another state, [when] similar benefits are to be realized" and (3) that "[a]lthough PASNY is not required to allocate a full 10 percent of Niagara Power to out-of-state entities, it is required to allocate a reasonable amount up to 10 percent." Id. at p. 61,232. FERC then ordered an evidentiary hearing on the question of whether PASNY was allocating a reasonable amount of preference power to out-of-state entities and whether, given the relative benefit the preference power would confer upon different neighboring states, CMEEC and MMWEC were entitled to any, and if so, how much, power. In response to Allegheny and to the application of CMEEC and MMWEC for a rehearing, FERC reaffirmed its holding that "out-of-state [preference] entities are not always entitled, as a matter of law, to allocations aggregating a full ten percent of project power." Order on Rehearing and Denying Motion, 18 FERC (CCH) p 61,217 at p. 61,440 (March 4, 1982). In the process, it rejected Allegheny's argument that the NRA's legislative history demonstrated that Congress intended "neighboring states" to only mean Ohio and Pennsylvania.
 
 
 23
 Administrative Law Judge George Lewnes held extensive hearings on the case throughout April and May of 1982. In March, 1983 he issued his decision. Initial Decision of the Administrative Law Judge, 22 FERC (CCH) p 63,087 (March 9, 1983). He concluded that the "reasonable amount up to 10%" requirement obligated PASNY to allocate the full 10% of all types of project power to out-of-state preference entities. He also adhered to FERC's earlier decision in State of Vermont Public Service Board, supra, rejecting the argument advanced by one of the intervenors in the suit, Municipal Electric Utilities Association of New York State ("MEUA") (the representatives of the New York preference customers), that VDPS, a state agency which procures power for private utilities and municipal systems, did not qualify as a preference customer. On the contrary, he held that VDPS was entitled to preference status even though it did not distribute power and had no facilities of its own. Somewhat inconsistently, however, he adopted by reference, id. at p. 65,289, the view that, by "public bodies" the NRA meant "governmental entities that resell and distribute the preference power to the people as consumers of such power." Opinion No. 151; Declaratory Opinion and Order Affirming with Modifications Initial Decision in Niagara Preference, 21 FERC (CCH) p 61,021 at p. 61,129 (Oct. 13, 1982) (FERC decision considering challenges to PASNY's allocation of power to preference customers in New York State). Accordingly he held that the MTA, which was not a power distributor but a user, was not entitled to preference power. FERC had previously so held, for the same reasons, in Opinion No. 151, supra, but, when the MTA argued that it had not been given adequate notice prior to Opinion No. 151 that its status as a preference customer would be adjudicated, FERC voided its decision and ordered the question of MTA's status to be decided in the MMWEC and CMEEC dockets. Opinion No. 151-A; Order on Rehearing Modifying Declaratory Opinion and Order on Niagara Preference With Respect to the Remedy, 23 FERC (CCH) p 61,031 (April 6, 1983)).
 
 
 24
 Upon review, FERC affirmed Judge Lewnes in most regards. Opinion No. 229; Declaratory Opinion and Order Affirming With Modifications Initial Decision on Niagara Preference Power for States Neighboring New York, 30 FERC (CCH) p 61,323 (March 27, 1985). It reiterated its earlier holdings that Massachusetts and Connecticut were "neighboring states" and that PASNY was not required, as a matter of law, to allocate 10% of the preference power to out-of-state entities. Id. at p. 61,645-47. FERC agreed with Judge Lewnes, however, that PASNY would not be acting reasonably under the current circumstances if it allocated less than 10% of the power to those out-of-state entities. FERC rested its finding on the fact that "New York State preference customers would not need 40 per cent of the project power until the winter of 19 86/87 ... [and that] PASNY will be acting arbitrarily and unreasonably if it sells preference power to non-preference customers in New York State while refusing to provide out-of-state preference customers the maximum amount of power available to them under the NRA. [Otherwise], the congressional intent to allocate 50 percent of the project power to preference customers [would be] defeated by PASNY's allocation decisions." Id. at p. 61,646. It accordingly ordered that, as of July 1, 1985 (the expiration date of many of PASNY's contracts to sell power generated by the Niagara and St. Lawrence Power Projects), PASNY must sell 10% of the Niagara power to preference customers outside of New York.
 
 
 25
 Since the New York preference customers had never used 40% of the preference power, it was implicit in FERC's holding that PASNY had not been selling enough preference power out of state for some time. FERC, however, refused the out-of-state preference customers' demand that it order PASNY to sell to CMEEC and MMWEC an extra allotment of power in the future to make up for the past shortfall. It reasoned that "since the supply of preference power and/or energy is finite, any recompense would be at the expense of other customers. [I]t would be unduly punitive to reduce the allocations of customers which were not at fault." Opinion 229, supra, 30 FERC at p. 61,656.
 
 
 26
 FERC agreed with the ALJ that the MTA was not a "public body" entitled to preference power. Overruling its earlier decision in State of Vermont Public Service Board, supra, it also held that neither was VDPS. Relying in part on our decision in Power Authority of the State of N.Y. v. F.E.R.C., 743 F.2d 93 (2d Cir.1984) (reviewing Opinion No. 151, supra, and Opinion No. 151-A, supra ) FERC decided that Congress intended the term "public bodies" to mean "public distribution systems" or "publicly-owned entities that are capable of selling and distributing power directly to consumers of electricity at retail." Opinion No. 229, supra, 30 FERC at p. 61,651. It found that Congress included the preference provisions in the NRA to foster "yardstick competition." The principle of yardstick competition is that "if the municipal entities (as distinguished from the end-users) are supplied with cheap hydropower their lower competitive rates will force the private utilities in turn to reduce their rates, with resulting benefits to all, including rural and domestic consumers." Power Authority of the State of N.Y., supra, 743 F.2d at 105. FERC concluded that neither MTA, a government entity which used all the preference power it received, nor VDPS, an entity which resold the power to private utilities, could compete with the private utilities or provide "yardstick competition." Accordingly, MTA and VDPS were not "preference customers" within the meaning of the NRA.
 
 
 27
 Virtually every party to Opinion 229 and several movants for intervention asked FERC for a rehearing. FERC complied and, in Opinion 229-A; Opinion and Order on Rehearing Clarifying Declaratory Opinion in Part, and Granting Petitions to Intervene Out of Time, 32 FERC (CCH) p 61,194 (July 30, 1985), affirmed its earlier opinion.
 
 
 28
 Shortly before Opinion 229-A was rendered, the Vermont legislature authorized VDPS "to distribute and sell at retail electrical energy purchased from the Niagara and St. Lawrence power projects directly to all rural and domestic consumers of electricity in Vermont by entering into agreements with Vermont electrical utilities that include, without limitation, the leasing of facilities and the providing of services to the department to distribute such electrical energy." 30 V.S.A. Sec. 212a. The law was intended to bring the Board within FERC's definition of "public body." In Opinion 229-A FERC expressly declined to rule on whether the legislature had succeeded, Opinion 229-A, supra, 22 FERC at n. 12, and the question is not before us on this appeal.
 
 DISCUSSION
 
 29
 Appellants raise four challenges to Opinion 229 and Opinion 229-A. MTA and a collection of Massachusetts utilities[4] challenge FERC's conclusion that MTA and VDPS are not "public bodies" entitled to preference power. Allegheny challenges FERC's holding that the term "neighboring states" includes states other than Pennsylvania and Ohio. It also seeks to challenge FERC's view that PASNY is not required, as a matter of law, to allocate 10% of the Project power to preference customers outside of New York State. Finally, CMEEC challenges FERC's conclusion that CMEEC and MMWEC are not entitled to retroactive relief for PASNY's past failure to sell a "reasonable" amount of preference power to out-of-state entities.
 
 The Definition of Public Bodies
 
 30
 As a general rule, a statute should be read according to its literal terms, United States v. Locke, 471 U.S. 84, 105 S.Ct. 1785, 1792, 85 L.Ed.2d 64 (1985); Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), unless this produces an interpretation which makes little sense, Chemical Mfrs. Ass'n v. Natural Res. Defense Coun., 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); United States v. Turkette, 452 U.S. 576, 587, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981), does violence to the purposes Congress sought to serve by the statute, Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979), or is otherwise "demonstrably at odds with the intentions of [the statute's] drafters." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). See also Locke, supra, 105 S.Ct. at 1792; Bread Political Action Committee v. F.E.C., 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982); Consumer Product Safety Commission, supra, 447 U.S. at 108, 100 S.Ct. at 2056. Literally, the term "public bodies" is not limited to "publicly-owned entities that are capable of selling and distributing power directly to consumers of electricity at retail." However, the legislative history of the NRA demonstrates that that is what Congress intended the term to mean.
 
 
 31
 As we noted in Power Authority of State of N.Y., supra, 743 F.2d at 105, Congress' intent in adopting the NRA's preference provisions was to foster "yardstick competition." S.Rep. No. 539, 85th Cong., 1st Sess. 7 (1957) ("S.Rep."); Development of Power at Niagara Falls, N.Y.: Hearings Before a Subcommittee of the Committee on Public Works on S. 512 and S. 1037, 85th Cong., 1st Sess. 12-13 (1957) ("S. Hearings") (Sen. Clark); 103 Cong.Rec. 14438 (1957) (Sen. Chavez).[5] Congress believed that it was necessary to create "publicly owned power" because "electric-power distribution tends to be a monopoly, and ... the only way to gain for the consumer the normal benefits that ... flow from competition is to develop public-power 'yardsticks' ". Minority Views of Senator Richard L. Neuberger, S.Rep., supra, at 10.[6] See also S. Hearings, supra, at 12-13 (Sen. Clark). The municipal utilities, Congress hoped, would act as yardsticks by using their supply of hydropower to charge rates which would force the private utilities to reduce their prices or at least serve as a measure by which regulators could set the private utilities' rate of return. Power Authority of the State of New York, supra, 743 F.2d at 105.
 
 
 32
 Yardstick competition would exist if publicly-owned utilities competed against privately-owned utilities in selling power to ultimate consumers. If the "public body" used the preference power itself, the privately-owned utilties would not face any pressure to reduce the prices they charge other customers. Similarly, if the "public body" simply resold the preference power to the privately-owned utilities (as did VDPS) the preference power would not have fostered competition. As Senator Neuberger observed, "public generation is not enough. The power must be made available to public and cooperative distributing systems, so that the public operation will extend from the turbine to the reading lamp in the living room. Only in that way is competition established." S.Rep., supra, at 10. See also S. Hearings, supra, at 12-13 (Sen. Clark). Indeed, if preference power were made available to all government bodies, whether or not they distributed that power to consumers, every town and local library would be entitled to claim a direct share. Niagara hydropower would be spread so thin that any competitive effect it might have had would be lost.
 
 
 33
 Accordingly, at least one senator stated that the preference clause gave priority to "municipalities which purchase or generate and sell their own power", 103 Cong.Rec. 14440 (Sen. Clark), as did congressmen and experts who treated "municipal utility", "municipal plant", "municipal electric system", and "municipal system" as synonymous with "public body" in their testimony. S.Rep., supra, at 10 (Sen. Neuberger); S. Hearings, supra, at 81 (Sen. Clark); id. at 23 (Sen. Neuberger); id. at 254 (Blaine Stockton, President, New York State Association of Rural Electric Cooperatives); id. at 282 (Clyde Ellis, General Manager, National Rural Electric Cooperative Association); 103 Cong.Rec. 13205 (Rep. Chudoff); id. at 13209 (Rep. Ryrd); 103 Cong.Rec. 14439 (Sen. Ives); id. at 14444 (Sen. Javits). In fact, it was implicit throughout the debates that "public bodies" were publicly-owned entities capable of distributing the preference power they received. The primary argument made by critics of the preference provision was that the provision would foster inefficiency by encouraging municipalities to qualify as buyers of preference power by building transmission lines and electric plants duplicating those of the privately-owned utilities. S. Hearings, supra, at 20 (Sen. Ives); id. at 32 (Rep. Miller); id. at 156 (Sen. Javits); id. at 237 (Andrew McMahon of Utility Workers Union of America, AFL-CIO). Obviously, that argument would have had little force if government bodies could receive the power whether or not they had the means to distribute it.[7]
 
 
 34
 The MTA argues that the yardstick competition theory makes little sense in today's energy market because the disparity between the low cost of hydropower and the higher cost of privately-produced power makes competition between the two close to impossible. In view of Congress' crystal clear intent to adopt the NRA's preference provision in order to create yardstick competition, that argument must be rejected. Assuming arguendo the improbability of such competition (although we take judicial notice of the recent sharp decline in the price of oil as a source of private power) "[i]t is not for FERC or ourselves to second-guess [Congress'] basic determination." Power Authority of the State of New York, supra, 743 F.2d at 105. Any rectification lies exclusively with Congress.
 
 
 35
 MTA also argues that, since one congressman noted that the bill made "provision for dealing with industrial and defense emergencies", 103 Cong.Rec. 13203 (Rep. Dooley) and a second referred to "defense projects or Government installations" as possible recipients of the preference power, id. at 14448 (Sen. Kerr), Congress could not have intended that preference power be made available only to public bodies capable of distributing the power to customers. The MTA reads too much into the congressmen's remarks. An earlier version of the NRA, S.512, 85th Cong., 1st Sess. (1957) required that PASNY should give "preference for the purchase of [Niagara Project] power to ... the defense agencies of the United States." Representative Dooley and Senator Kerr apparently believed that the provision finally adopted retained that preference. S. 512, however, never offered a preference to non-defense related government bodies which did not distribute the power to consumers. Accordingly, even if the NRA's preference provision should be read in light of S. 512, the congressmen's remarks do not suggest that non-defense bodies such as the MTA and VDPS merit preference power.
 
 
 36
 We therefore affirm FERC's conclusion that the term "public bodies" in 16 U.S.C. Sec. 836(b)(1) means "publicly-owned entities that are capable of selling and distributing power directly to consumers of electricity at retail." MTA does not contend that it satisfies that definition and VDPS does not argue that it satisfied the definition prior to the passage of 30 Vt.Stat.Ann. Sec. 212a, see supra at 13. Neither MTA nor VDPS were purchasing hydropower from PASNY for resale to customers at retail. MTA was not reselling the power at all. By reselling power to private utilities VDPS was lessening any potential competition on their part in the distribution of the power which might occur if the preference power were distributed through municipal utilities. Accordingly, we affirm FERC's conclusion that VDPS, as constituted prior to 1986, and MTA are not "public bodies" entitled to purchase preference power from PASNY.[8]The Definition of "Neighboring States"
 
 
 37
 Title 16 U.S.C. Sec. 836(b)(2) requires PASNY to provide preference power "for use within reasonable economic transmission distance in neighboring states." Unlike Congress' use of the term "public bodies", there is no evidence that it intended "neighboring states" as used in this phrase to have any meaning other than its literal one: states found to be within reasonable geographical proximity of New York, after taking into account all relevant factors and whether they are within reasonable economic transmission distance. Massachusetts and Connecticut border New York and fall within that definition. Allegheny argues, however, that the NRA's legislative history reveals that Congress meant "neighboring states" to only refer to Pennsylvania and Ohio. We disagree.
 
 
 38
 In 1957 there was some doubt about what the "economic transmission distance" was for Niagara hydropower, but congressmen and witnesses agreed that it was between 150 and 400 miles.[9] Accordingly, Congress acknowledged when adopting the NRA that for a time only customers in western Pennsylvania and northeastern Ohio would receive power under Sec. 836(b)(2). See, e.g., S.Rep., supra, at 5, 6; H.Rep. No. 862, 85th Cong., 1st Sess., reprinted in 1957 U.S.Code Cong. & Ad.News 1587, 1592, 1593.[10]
 
 
 39
 No congressman suggested, however, that Sec. 836 meant that Niagara power should always be available only to those limited areas which happened to be within economic transmission distance in 1957. To the contrary, congressmen acknowledged that economic transmission distances were mutable, S. Hearings, supra, at 176 (Dialogue between Sen. Cotton and Thomas Moore, Counsel for New York Power authority); id. at 15 (Sen. Ives), and rejected a suggestion that Sec. 836(b)(2) be amended to provide that Niagara power would only be available to the portions of "neighboring states" within 300 miles of the Project. 103 Cong.Rec. 13196-97. Several congressmen stated that states other than Ohio and Pennsylvania could receive power if they were within economic transmission distance. 103 Cong.Rec. 13204 (Rep. Miller states Massachusetts would receive power if it could prove it was within economic transmission distance); id. at 13198 (Letter read into record responding to Sen. Clark's claim that Niagara power could be sold to preference customers in Michigan); id. at 13211 (Rep. McGregor suggests Indiana could receive Niagara power). See also S. Hearings, supra, at 131 (Robert Moses notes that Massachusetts and New Hampshire decided not to request Niagara power because they were not within economic transmission distance). Senator Chavez expressed the hope that Niagara power would lower power rates and increase electricity use in New England and "a large part of the northeastern section of our country", 103 Cong.Rec. 14438, strongly suggesting that he intended Niagara Project power to be available to portions of "neighboring states" other than the northwestern corner of Pennsylvania and the northeastern tip of Ohio.
 
 
 40
 The Amount of Power PASNY Must Allocate to Preference Customers Outside New York
 
 
 41
 Allegheny argues that PASNY is required as a matter of law to sell 10% of the Niagara Project power to preference customers outside of New York, so long as those customers are willing to buy the power. PASNY, on the other hand, relying on the language of 16 U.S.C. Sec. 836(b)(2), which obligates PASNY to make available to preference users outside of New York a "reasonable portion of the project power" not to exceed 10%, takes the position that 10% is not so mandated at all times since a reasonable portion might sometimes be less than 10%. The issue is rendered currently academic for the reason that FERC and PASNY both agree that at the present time it would be unreasonable for PASNY to sell less than 10% of the Project's power to out-of-state customers. All parties, therefore, conceded that PASNY must presently sell 10% of the Project power out-of-state. Accordingly, Allegheny's appeal amounts to no more than a request for a declaration that its construction of Sec. 836(b)(2) is more rational than that of FERC or PASNY. Since to do so would be a mere academic exercise that could not "affect the result as to the thing in issue in the case," Village of Ilion v. FERC, 790 F.2d 212, 217 (2d Cir.1986) (quoting California v. San Pablo & Tulare Railroad, 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893)), we dismiss Allegheny's argument as moot.
 
 
 42
 Finally, CMEEC contends that FERC erred in failing to order PASNY to sell to MMWEC and CMEEC an extra allotment of Niagara power to compensate it for PASNY's past failure to sell them Niagara power that they had a right to buy. FERC denied CMEEC and MMWEC retroactive relief for the reason that, since the pool of preference power is finite, granting CMEEC and MMWEC an extra allotment would take power from the pocket of other preference customers and thus improperly penalize them for a wrong which PASNY, not they, had committed.
 
 
 43
 Though FERC's remedial actions must "be reasonably commensurate with the needs of the case," and their purpose must not be "to punish or confer a windfall on the complainant," it has "broad discretion in determining what relief is appropriate to remedy a violation of the NRA." Power Authority of the State of New York, supra, 743 F.2d at 112. See also Niagara Mohawk Power Corp. v. Federal Power Com'n, 379 F.2d 153, 159 (D.C.Cir.1967). We do not believe that FERC abused its discretion in the present case. FERC's decision, that preference customers (and the end-users they serve) should not suffer because at some time in the past PASNY sold them power which should have gone to CMEEC and MMWEC, is reasonable. CMEEC's suggestion that those customers were somehow at fault because they applied to PASNY for the power does not alter our view.
 
 CONCLUSION
 
 44
 We affirm FERC's holding (1) that, for purposes of 16 U.S.C. Sec. 836(b) "public bodies" are "publicly-owned entities capable of selling and distributing power directly to consumers of electricity at retail", not consumers or brokers, (2) that Connecticut and Massachusetts are "neighboring states", and (3) that CMEEC and MMWEC are not entitled to retroactive relief for PASNY's past failure to sell them Niagara power. We dismiss as moot Allegheny's claim that PASNY is required, as a matter of law, to sell 10% of the power produced by the Niagara Project to preference customers outside of New York.
 
 
 
 [1]
 The orders are: Opinion No. 229; Declaratory Opinion and Order Affirming With Modifications Initial Decision on Niagara Preference Power for States Neighboring New York, 30 FERC (CCH) p 61,323 (March 27, 1985); Opinion No. 229-A; Opinion and Order on Rehearing Clarifying Declaratory Opinion in Part, and Granting Petitions to Intervene Out of Time, 32 FERC (CCH) p 61,194 (July 30, 1985)
 
 
 [2]
 Prior to 1980 VDPS was called the Vermont Public Service Board (VPSB)
 
 
 [3]
 During the course of the consolidated proceeding the presiding administrative law judge allowed several other parties to intervene. These included the Metropolitan Transit Authority (MTA), Boston Edison Company, Eastern Edison Company, Fitchburg Gas and Electric Light Company and Massachusetts Electric Company, who are appellants before this court. After FERC issued its decision, Opinion No. 229; Declaratory Opinion and Order Affirming With Modifications Initial Decision in Niagara Preference Power for States Neighboring New York, 30 FERC (CCH) p 61,323 (March 27, 1985), it allowed yet another appellant in this case, the New Jersey Board of Public Utilities, to intervene and request a rehearing. Opinion No. 229-A; Opinion and Order on Rehearing Clarifying Declaratory Opinion in Part, and Granting Petitions to Intervene Out of Time, 32 FERC (CCH) p 61,194 (July 30, 1985). By the time the case reached this court, FERC had allowed 16 parties to intervene. Eight of them, along with CMEEC, petitioned for review of FERC's order. In an orgy of redundancy, CMEEC and the 16 intervenors filed a plethora of briefs in this appeal. This waste and excessive burden on the court indicates the need for more restrictive orders by Staff Counsel under our Civil Appeals Management Plan as a means of avoiding unnecessary duplication
 
 
 [4]
 Boston Edison Company, Eastern Edison Company, Fitchburg Gas and Electric Light Company and Massachusetts Electric Company. Since Massachusetts has planned to form an agency similar to VDPS (prior to the Vermont legislature's recent change in that organization) these Massachusetts companies would stand to benefit if the former VDPS were held to be a "public body"
 
 
 [5]
 Witnesses who testified before Congress emphasized that the preference provision was designed to foster yardstick competition. See S. Hearings, supra, at 269 (Statement of Edward Lindey, President, Central Electric Cooperative, Pa.); id. at 282 (Statement of Clyde Ellis, General Manager, National Rural Electric Cooperative Association); id. at 305 (Statement of Alex Radin, General Manager, American Public Power Association); id. at 314 (Statement of Leland Olds, Director, Energy Research Associates)
 
 
 [6]
 Senator Neuberger did not differ from the majority in his view of why a preference provision was necessary. He only disagreed with the Senate's conclusion that the provision should only aply to 50% of the Project power. Power Authority of the State of New York, supra, 743 F.2d at 101; S.Rep., supra, at 10
 
 
 [7]
 We also note that Congress considered the NRA's preference provision to be a standard "federal-type" preference. Power Authority of the State of New York, supra, 743 F.2d at 105. The federal power acts adopted prior to the NRA seem to have equated "public bodies" with publicly-owned utilities. Several contained provisions stating that public bodies should not be denied an allotment of preference power "on the ground that any proposed bond or other security issue of any such public body or cooperative, the sale of which is necessary to enable such prospective purchaser to enter into the public business of selling and distributing the electric energy proposed to be purchased, has not been authorized or marketed, until after a reasonable time, ... has been afforded such public body or cooperative to have such bond or other security issue authorized or marketed." The Bonneville Project, 16 U.S.C. Sec. 832c. (Emphasis supplied). See also The Boulder Canyon Project, 43 U.S.C. Sec. 617d(c); Tennessee Valley Authority, 16 U.S.C. Sec. 831k
 These provisions assume that a public body cannot receive preference power unless it has entered "into the business of selling and distributing ... electric energy". Otherwise, if these bodies were entitled to purchase federal power without entering into the business of distributing it to others, such provisions would have been superfluous.
 Similarly, provisions in federal power acts permitting a public body to resell power to nonpreference customers, subject to a priority for public bodies, see, e.g., the Bonneville Act, 16 U.S.C. Sec. 832d, are consistent with the requirement that the public bodies be distributors. Indeed, we held in PASNY Public Authority of the State of New York, supra, 743 F.2d at 104-05, that municipal utilities purchasing hydropower from PASNY may resell it to industrial users.
 
 
 [8]
 The other arguments advanced in support of the claim that the term "public body" should be construed to include a consumer such as MTA merit little discussion. The NRA's provision of a rate-setting mechanism for resale of project power by municipal utilities to nonpreference customers, 16 U.S.C. Sec. 836(b)(5), is irrelevant to the definition of a public body. The NRA does not require FERC to ignore yardstick competition in favor of subsidizing mass transit, as MTA argues, or to classify the MTA as a "public body" under the Act on the ground that this will promote environmental considerations by enabling the MTA to avoid using more expensive fuel. Congress' intent controls. See City of Santa Clara v. Andrus, 572 F.2d 660, 679-80 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). Moreover, even if MTA's subways were permitted to buy the cheaper hydropower directly (rather than from a distributor of preference power), other customers would then be forced to use the more expensive fuel claimed to pollute the environment
 
 
 [9]
 S. Hearings, supra, at 26, 56 (Rep. Miller) (150 miles); id. at 131 (Robert Moses, Chairman of the New York Power Authority) (same); id. at 176 (Thomas Moore, General counsel, New York Power Authority) (same); 103 Cong.Rec. 13196 (Rep. Blatnik) (same); id. at 13196 (Rep. Chudoff) (150-300 miles); id. at 13198 (Rep. McGregor) (150-400 miles); id. at 14440 (Sen. Clark) (150-300 miles); id. at 14443 (Sen. Javits) (150 miles)
 
 
 [10]
 See also 103 Cong.Rec. 13195 (Rep. Buckley); id. (Rep. Blatnik); id. at 13198 (Rep. McGregor); id. at 13205 (Rep. Kluczynski); id. at 13206 (Rep. Ostertag); id. at 13208 (Rep. Flood); id. at 14439 (Sen. Ives); id. at 14439-40 (Sen. Clark); id. at 14445 (Sen. Neuberger); id. at 14454 (Sen. Carroll); id. at 14450 (Sen. Kerr); id. at 14455 (Sen. Martin); id. at 14452 (Sen. Lausche)