**VILLAGE OF BERGEN, Village of Boonville, Village of Fairport, Village of Freeport, Village of Greenport, Village of Penn Yan, Village of Rockville Centre, Village of Solvay, City of Jamestown, and Town of Massena, New York, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Vermont Department of Public Service, et al., Intervenors.**

No. 93–1693.

United States Court of Appeals, District of Columbia Circuit.

Argued May 13, 1994.

Decided Sept. 16, 1994.

Richmond F. Allan, with whom Wallace L. Duncan, Jeffrey C. Genzer, and Thomas L. Rudebusch, Washington, DC, were on the briefs, for petitioners.

Samuel Sooper, Atty., F.E.R.C. ("FERC"), with whom Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., FERC, Washington, DC, were on the brief, for respondent.

Scott H. Strauss, with whom David R. Straus, Harvey Reiter, and Robert Weinberg, Washington, DC, were on the briefs, for intervenors Connecticut Mun. Elec. Energy Co-op., et al.

Arthur T. Cambouris, New York City, with whom David B. Raskin and Brian R. Gish, Washington, DC, were on the brief, for intervenor Power Authority of the State of New York.

Kathleen L. Mazure and William I. Harkaway, Washington, DC, entered an appearance for intervenor Vermont Dept. of Public Service.

Before MIKVA,* Chief Judge, and BUCKLEY and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Several villages and other municipalities located in the State of New York ("Villages") petition for review of an order of the Federal Energy Regulatory Commission dismissing their complaint for lack of jurisdiction. The complaint asserts that the Power Authority of the State of New York ("PASNY") has violated a condition of its license and a provision of the Niagara Redevelopment Act by unduly increasing the rates for hydroelectric power generated by the Niagara River. A group of power cooperatives from neighboring states ("the out-of-state cooperatives") has intervened in support of the petition for review, while PASNY has intervened in sup-

port of the Commission's order. We deny the petition because the Commission reasonably found that nothing in PASNY's license or the NRA empowers it to review PASNY's rates.

## I. BACKGROUND

### A. Legal Framework

This case involves the interplay among three statutes. The first is the Power Authority Act, N.Y.Pub.Auth.Law §§ 1000–1017 (McKinney 1982 & Supp.1994), a New York statute enacted in 1939. The Act directs PASNY, a "corporate municipal instrumentality of the state," *id.* § 1002 (McKinney Supp.1994), to build and operate hydroelectric projects on the St. Lawrence and Niagara Rivers. *See generally id.* § 1005 (McKinney 1982 & Supp.1994).

The Act also contains several provisions governing the rates PASNY may charge for the electricity it produces. For example, PASNY must sell power to "municipalities and political subdivisions at prices representing cost of generation, plus capital and operating charges, plus a fair cost of transmission, all as determined by the trustees [of PASNY].... " *Id.* § 1005(5) (McKinney 1982). In addition, "[c]ontracts for the sale, transmission and distribution of power," *id.* § 1005, entered into by PASNY must provide for, *inter alia,* "[f]ull and complete disclosure ... of all factors of cost in the transmission and distribution of power, so that rates ... may be adjusted from time to time on the basis of true cost data," *id.* § 1005(5)(e), as well as "[p]eriodic revisions of the service and rates to consumers on the basis of accurate cost data obtained by such accounting methods and systems as shall be approved by the trustees ...," *id.* § 1005(5)(f); also, such contracts may provide for "different rates for different localities, classes of consumers, and amounts of current consumed.... " *Id.* § 1005(5)(h). Disgruntled customers may challenge violations of these rate standards in state court.

---

* *Chief Judge* MIKVA, a member of the panel when the case was argued, took no part in its disposi-    tion.

*See, e.g., Advanced Refractory Technologies, Inc. v. Power Auth. of the State of New York,* 81 N.Y.2d 670, 603 N.Y.S.2d 285, 623 N.E.2d 6 (1993).

The second statute is the Niagara Redevelopment Act, which Congress passed in 1957. Pub.L. No. 85–159, 71 Stat. 401 (codified as amended at 16 U.S.C. §§ 836, 836a (1988)) ("NRA"). The NRA stems from a 1950 treaty between the United States and Canada that provides for equal sharing of the water flowing in the Niagara River. *Municipal Elec. Utils. Ass'n of the State of New York v. Power Auth. of the State of New York,* 21 F.E.R.C. ¶ 61,021 at 61,106 (1982), *modified on other grounds sub. nom. Power Auth. of the State of New York v. FERC,* 743 F.2d 93 (2d Cir.1984). It directs the Commission to issue a license to PASNY "for the construction and operation of a power project with capacity to utilize all of the United States share of the water of the Niagara River permitted to be used by international agreement." 16 U.S.C. § 836(a).

The license must include seven conditions "in addition to those deemed necessary and required under the terms of the Federal Power Act [16 U.S.C. [§] 791a et seq.]." *Id.* § 836(b). At issue in this case is the first of these seven, which appears in section 1(b)(1) of the NRA and provides in pertinent part:

> In order to assure that at least 50 per centum of the project power shall be available ... primarily for the benefit of the people as consumers, particularly domestic and rural consumers, *to whom such power shall be made available at the lowest rates reasonably possible* and in such manner as to encourage the widest possible use, the licensee in disposing of 50 per centum of the project power shall give preference and priority to public bodies and nonprofit cooperatives within economic transmission distance.

*Id.* § 836(b)(1) (emphasis added). The Villages and out-of-state cooperatives are "public bodies and nonprofit cooperatives" that purchase power from PASNY and resell it to individual consumers. Their claim here is that the Commission misinterpreted the language italicized above.

On January 30, 1958, the Commission issued a license to PASNY for the Niagara Project that incorporated section 1(b)(1) of the NRA as Article 20. *Power Auth. of the State of New York, Project No. 2216,* 19 F.P.C. 186, 193 (1958). The license also included the six other NRA-mandated conditions as well as thirty-three conditions imposed by the Commission as necessary or required under the Federal Power Act. *Id.* at 193–96.

The third statute involved here is the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a–828c (1988 & Supp. IV 1992), which empowers the Commission to issue and enforce licenses. *Id.* § 823b(a) (1988) ("The Commission shall monitor and investigate compliance with each license and permit issued under this subchapter...."). The FPA also grants the Commission broad rate-making authority and includes numerous procedures, such as notice, hearings, and rate-filing requirements, to enable it to exercise that authority. *See id.* §§ 824d, 824e (1988). State and federal instrumentalities, however, are exempt from the Commission's rate-making authority. *Id.* § 824(f) (1988).

### B. Procedural History

On February 12, 1992, PASNY proposed a rate hike for power from the Niagara Project. After a public comment period, PASNY approved an increase averaging 13.5 percent annually for four years. On August 27, 1992, the Villages challenged the rate increase in New York state court; that action has been stayed pending the outcome of this proceeding. The following day, they filed a complaint with the Commission, relying on the NRA and section 306 of the FPA, 16 U.S.C. § 825e (1988). As amended, the complaint alleged that PASNY's new rates would recover costs unrelated to the Niagara Project and would thereby "charg[e] the [Villages] substantially more than the lowest rates reasonably possible for energy from the Niagara Power Project" in violation of sec-

tion 1(b)(1) of the NRA and Article 20 of PASNY's license. Amended Complaint, Federal Energy Regulatory Commission Docket No. EL 92–38 at 2, 9 (1992).

On July 15, 1993, the Commission dismissed the complaint, concluding that "we do not have jurisdiction to regulate [PASNY's] rates for preference power." *Villages of Andover, et al. v. Power Auth. of the State of New York,* 64 F.E.R.C. ¶ 61,066 at 61,611 (1993). "Preference power" is "that portion of the Niagara Project's power that is to be allocated to 'public bodies,' " such as the Villages, pursuant to the NRA. *Id.* at 61,608 n. 2. The Commission ruled that

> while the NRA and the license conditions of the Niagara Project's license give the Commission the power to rule on the *allocation* of preference power among preference customers, i.e., who gets preference power, they do not confer *rate* jurisdiction on the Commission.

*Id.* at 61,611 (emphasis in original; footnote omitted). Instead, "[PASNY's] rate decisions [are] subject to review in the New York courts." *Id.* In denying rehearing on September 24, 1993, the Commission elaborated:

> Nowhere in the NRA is there set forth a process for the Commission to utilize in setting or reviewing [PASNY's] rates.... We are hard-pressed to conclude that Congress intended for the Commission to closely review [PASNY's] rates on a cost-of-service basis without providing for some process for the Commission to utilize in evaluating the rates or, indeed, even for the filing of the rates.

*Villages of Andover, et al. v. Power Auth. of the State of New York,* 64 F.E.R.C. ¶ 61,358 at 63,477–78 (1993). The Villages filed a petition for review on October 15, 1993.

## II. Discussion

### A. Standard of Review

■ Invoking *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Commission asserts that its construction of the NRA is entitled to deference because the statute does not specifically address whether it has authority to review PASNY's rates. Under *Chevron,* courts must uphold an agency's reasonable interpretation of an ambiguous provision in a statute it is entrusted to administer. 467 U.S. at 842–44, 104 S.Ct. at 2781–82. The Villages contend, however, that no deference is due because the Commission's decision rests not on any particular language in the NRA but on external considerations.

■ We agree with the Commission. *Chevron* applies not only to an agency's construction of ambiguous language but also to its efforts to fill statutory gaps:

> [I]f the statute is *silent or ambiguous* with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> The power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules *to fill any gap left, implicitly or explicitly, by Congress.*

467 U.S. at 843, 104 S.Ct. at 2782 (emphasis added; internal quotation marks and footnote omitted).

■ We also reject the suggestion of the out-of-state cooperatives that *Chevron* does not apply to an agency's determination of its own jurisdiction. This court has recently held that such determinations fall under the *Chevron* umbrella. *Oklahoma Natural Gas Co. v. FERC,* 28 F.3d 1281, 1283–84 (D.C.Cir. 1994) (citing cases). Finally, we believe that the NRA's grant of authority to the Commission to issue a license to PASNY and prescribe conditions it deems necessary under the FPA shows that the Commission is "entrusted to administer" the NRA. *Compare New York Shipping Ass'n v. FMC,* 854 F.2d 1338, 1363 (D.C.Cir.1988) (noting that it "would ... be inappropriate ... to defer" under *Chevron* to Federal Maritime Commission's interpretation of Maritime Labor Agreements Act because statute was not one "Congress has charged [the agency] to ad-

minister"). Thus, we must uphold the Commission's interpretation of the NRA as long as it is reasonable. *Accord Power Auth. of the State of New York v. FERC,* 743 F.2d 93, 103 (2d Cir.1984) (deferring to FERC's interpretation of section 1(b)(1) of the NRA).

## B.  Merits

■ The Villages' petition for review rests on a fourteen-word dependent clause that appears in section 1(b)(1) of the NRA: "... domestic and rural consumers, *to whom such power shall be made available at the lowest rates reasonably possible ....*" 16 U.S.C. § 836(b)(1) (emphasis added). They argue that because this language also appears in PASNY's license, the Commission has jurisdiction over their complaint by virtue of its authority to enforce licenses. *See* 16 U.S.C. § 823b(a). We find reasonable the Commission's view that these few words do not reflect a congressional intent to authorize the Commission to review PASNY's rates.

In the FPA, Congress has erected a comprehensive scheme that enables the Commission to review and set rates for electricity. This scheme requires power companies to file rate schedules with the Commission and give public notice of proposed rate changes. *Id.* § 824d(c), (d) (1988). It also includes hearing procedures, *id.* §§ 824d(e), 824e(a) (1988), and substantive standards for scrutinizing and setting rates. *Id.* § 824d(a) (1988). As the Villages concede, however, PASNY is exempt from these provisions because it is a state instrumentality. *See id.* § 824(f); N.Y.Pub.Auth.Law § 1002. Moreover, the NRA expresses no clear intent to except PASNY from the FPA exemption. *See* 2A Norman J. Singer, Sutherland Statutory Construction § 47.11 (5th ed. 1992) ("It has been held that exceptions [to statutory language] are not to be implied") (footnote omitted).

Thus, any procedures and substantive standards that might assist the Commission in reviewing PASNY's rates must come from the NRA. The NRA mentions "rates" in only two places: (1) the fourteen-word dependent clause of section 1(b)(1), which is set

forth above, and (2) section 1(b)(5), which provides that

[i]n the event project power is sold to any purchaser for resale, contracts for such sale shall include adequate provisions for establishing resale rates, to be approved by the licensee, consistent with paragraphs (1) and (3) of this subsection.

16 U.S.C. § 836(b)(5). In the absence of *any* provisions governing the establishment of rates, these references are a thin reed on which to rest an authority to review those mandated by a state instrumentality. The out-of-state cooperatives contend that the Commission can devise its own rate-review and rate-making procedures, and perhaps it can. The issue, however, is not whether the Commission could devise some way to review PASNY's rates but whether Congress intended it to do so. If Congress had wanted the Commission to get into the business of reviewing PASNY's rates, one would have expected it to equip the agency with the necessary tools.

The absence of specific rate-making provisions in the NRA becomes even more striking when that 1957 statute is compared with federal statutes that established hydroelectric projects in the 1930s and 40s. The preference provisions in the NRA, *see* 16 U.S.C. § 836(b)(1), (2), parallel provisions in these statutes. For example, the statute creating the Bonneville Project on the Columbia River, which Congress passed in 1937, 50 Stat. 731, includes the following preference language:

In order to ensure that the facilities for the generation of electric energy at the Bonneville project shall be operated for the benefit of the general public, and particularly of domestic and rural consumers, the administrator [of the Bonneville Power Administration] shall ... give preference and priority to public bodies and cooperatives.

. . . .

To preserve and protect the preferential rights and priorities of public bodies and cooperatives ... there shall be

available for sale to public bodies and cooperatives not less than 50 per centum of the electric energy produced at the Bonneville project. . . .

16 U.S.C. § 832c(a), (b) (1988).

The Bonneville Power Administration is a federal instrumentality, *see id.* § 832a(a) (1988), and thus, like PASNY, is exempt from the rate-review provisions of the FPA. *See id.* § 824(f). Unlike the NRA, however, the Bonneville statute contains its own rate-making scheme, requiring the Bonneville Power Administrator to prepare rate schedules according to specific cost standards, *id.* § 823f(1988) ("[r]ate schedules shall be drawn having regard to the recovery . . . of the cost of producing and transmitting such electric energy"), and subjecting all rates to review by the Secretary of Energy. *Id.* § 832e (1988). Similarly, the 1938 statute creating the Fort Peck Project, 52 Stat. 403, which contains a preference for "public bodies and cooperatives," supplies its own rate-making apparatus. *See* 16 U.S.C. §§ 833c (1988) (preference provision), 833d (1988) (requiring Bureau of Reclamation to prepare rate schedules subject to review by Secretary of Energy), 833e (1988) (requiring preparation of rate schedules with "regard to the recovery . . . of the cost of *producing and transmitting such electric energy*").

The Tennessee Valley Authority Act of 1933 offers an even more telling comparison. 48 Stat. 58. Much like section 1(b)(1) of the NRA, it contains a preference provision with a dash of rate-related language:

[T]he projects herein provided for shall be considered primarily as for the benefit of the people . . . and particularly the domestic and rural consumers to whom the power can economically be made available, and accordingly . . . sale to and use by industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use *at the lowest possible rates* and in such manner as to encourage increased domestic and rural use of electricity.

16 U.S.C. § 831j (1988) (emphasis added). Apparently, however, Congress did not regard this passing reference to rates as sufficient to authorize rate-making activity because it added to the statute a specific rate-making provisions, *id.* § 831n–4(f) (1988) (requiring Tennessee Valley Authority Corporation to "charge rates for power which will produce gross revenues sufficient to provide funds for operation, maintenance, and administration of its power system"), and a rate standard for retail energy transactions. *Id.* § 831k (1988) (requiring Corporation to elicit pledges from for-profit wholesale customers that all resales "shall be made to the ultimate consumer of such electric power at prices that shall not exceed a schedule fixed by the board [of directors] . . . as reasonable, just, and fair").

The absence of rate-making provisions in the NRA is readily explained. PASNY preexisted the Niagara Project and had been setting rates for 18 years prior to the enactment of the NRA. It did so according to the specific standards set forth in New York's Power Authority Act, *see* N.Y.Pub.Auth.Law § 1005, and under the reviewing eye of New York courts. As the Commission observed, "[w]hen the NRA was passed, there already existed state ratemaking procedures for setting [PASNY's] rates. Congress did not change those procedures." *Villages of Andover,* 64 F.E.R.C. ¶ 61,358 at 63,478. Although there may be other explanations for the conspicuous omissions in the NRA, we find reasonable the Commission's explanation that Congress meant to leave intact the state-law rate-making and rate-review framework when it created the Niagara Project.

Confronted with the glaring absence of specific rate-making provisions in the NRA, the Villages characterize their complaint as a mere attempt to enforce a license condition. According to the Villages, they are not asking for "conventional rate making" but seek, instead, only one-time enforcement of a single rate standard, a proceeding that, in their view, would not lead to "year-in, year-out" review of PASNY's rates by the Commission. Brief for Petitioners at 22–24.

 

But it is hard to see how the Commission could escape regular, plenary rate review if it accepted jurisdiction over the Villages' complaint. The complaint alleges that PASNY is charging "rates ... which include costs that are not actual and legitimate costs of the [Niagara] Project" and that "PASNY's rate setting methodology ... produces results greatly in excess of the actual costs of the Niagara Project." Amended Complaint, Federal Energy Regulatory Commission Docket No. EL 92–38 at 9 (1992). The complaint then plunges into a detailed analysis of the costs behind PASNY's rate increase. For example, it asserts that "PASNY's failure to subfunctionalize costs on the basis of labor ratios ... results in ... rates ... that bear absolutely no relationship to the actual costs of operating the Project," and that "PASNY's use of capacity rather than labor ratios to assign headquarters costs to the hydroelectric cost of service violates a fundamental tenet of utility ratemaking...." *Id.* at 17. Finally, the complaint requests an evidentiary hearing and urges the Commission to "order that the energy rate ... be reduced to the lowest rates reasonably possible, defined as 3.34 mills/kWh" and to "order PASNY forthwith to revise its rates ... to exclude all [unrelated] costs." *Id.* at 37–38.

These allegations show that the proceeding the Villages seek would entail far more than the ministerial enforcement of a discrete license condition. We agree with the Commission that "as a practical matter, [it] cannot decide that the preference power rates complained of are 'the lowest rates reasonably possible' without looking at the underlying costs and thus 'set[ting] or regulat[ing] PASNY's rates in the conventional sense.'" *Villages of Andover,* 64 F.E.R.C. ¶ 61,358 at 63,477 n. 11. While this is apparently the first time in the history of the Niagara Project that any party has asked the Commission to review PASNY's rates, we believe it likely that such requests would become routine were we to sanction the Commission's intervention in this case.

Finally, the out-of-state cooperatives argue that the Commission's interpretation of section 1(b)(1) will allow PASNY to charge discriminatory rates to its out-of-state custom-ers and that "Congress certainly did not intend that in such circumstances the only avenue for relief would be to file for review by a New York state appellate court." Brief for Intervenor Out-of-State Cooperatives at 20. Because that issue is not before us, we decline to address it.

### III. CONCLUSION

For the foregoing reasons, the petition for review is

*Denied.*